232 N.J. Super. 249 (1989)
556 A.2d 1271
IN MATTER OF THE APPLICATION OF THOMAS MALLON TO CONTEST THE ELECTION OF DONALD FREAM TO THE OFFICE OF COUNCILPERSON OF THE BOROUGH OF POINT PLEASANT.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1989.
Decided April 19, 1989.
*252 Before Judges PETRELLA, SHEBELL and LANDAU.
Thomas G. Gannon argued the cause for appellant/cross-respondent Donald Fream (Hiering & Hoffman, attorneys; Thomas G. Gannon on the brief).
Robert A. Ballou, Jr. argued the cause for respondent/cross-appellant Thomas Mallon (Starkey, Kelly, Blaney & White, attorneys; Robert A. Ballou and Anthony Mancuso, on the brief).
John C. Sahradnik argued the cause for appellant-intervenor Ocean County Clerk (Berry, Kagan, Privetera & Sahradnik, attorneys; John C. Sahradnik and Dina R. Khajezadeh, on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This appeal relates to a contested election for one of two full-term seats on the municipal council in the Borough of Point Pleasant.[1] Thomas Mallon, a Democratic candidate, obtained a recount of the votes cast for the council candidates at the *253 November 8, 1988 general election. After the recount, Mallon instituted a suit in the Law Division challenging the election results and, in particular, the seat won by Donald Fream, a Republican candidate. The trial judge set aside the election as to the disputed municipal council seat. We now reverse.
After a four day trial in the Law Division, the judge concluded that one illegal vote, which he found had been cast for candidate Fream, should be deducted, thus narrowing the margin of victory to one vote. He also found that certain irregularities and illegal votes gave rise to sufficient malconduct to challenge the election results for the council position and ordered a runoff election between Fream and Mallon.
Fream argues on this appeal that the evidence before the court was insufficient to warrant a finding of malconduct by election officials sufficient to challenge the result, and that the evidence at trial was sufficient to find that his margin of victory should be increased to three votes.
Mallon cross-appealed on the ground that certain "marked" absentee ballots should have been disallowed by the trial judge, and that the civilian absentee ballot of one individual was wrongly rejected at the polling place.
We granted the Ocean County Clerk's motion to intervene on this appeal. The County Clerk contends that he was an indispensable party (see R. 4:28) and that the petitioner's attempt to challenge the conduct of his office concerning issuance of certain absentee ballots without naming him as a party to the proceeding constitutes reversible error and deprived the trial court of personal jurisdiction over him. The County Clerk also argues that there was insufficient evidence to warrant any finding of malconduct sufficient to challenge the election results.
Although we agree with much of the trial judge's thoughtful letter opinion of January 26, 1989, and accordingly dismiss the cross-appeal, we conclude that the judge erred in finding malconduct by the County Clerk within the meaning of *254 N.J.S.A. 19:29-1a. We further find that the County Clerk was a necessary party who should have been noticed in the order to show cause. However, the County Clerk had ample knowledge of this contested election suit and hence there was no prejudice in the omission. Moreover, in light of our decision the issue is moot.
The facts are summarized hereinafter. After the November 8, 1988 general election, Mallon filed a verified petition and order to show cause[2] to challenge the election results for the Borough Council position. Mallon sought a revocation of the Certificate of Election issued to Fream and a declaration that he was elected or, alternatively, that the election for the disputed council seat be declared void and a special election ordered between them. Mallon alleged that a number of votes cast in the election were illegal, and should be disallowed. He also argued that certain actions of election officials involving the receipt of or refusal to accept absentee ballot votes constituted malconduct on the part of the Ocean County Board of Elections.
Fream counterclaimed alleging that Mallon's vote tally should be reduced by one since an absentee ballot cast on behalf of Mallon was illegal and void. At the trial in December 1988 and January 1989 some of the individuals whose votes had been challenged testified, as did certain election officials. It was stipulated that the Ocean County Board of Elections had certified the official recount results as follows:

*255
 Candidate Votes Counted
 Peter Marone (D) 3,991
 Donald Fream (R) 3,782
 Thomas Mallon (D) 3,780
 Herbert Ludwig (R) 3,751

Therefore, the election for the second council seat was decided on a two vote difference between Fream and Mallon.
It was also stipulated that civilian absentee ballots were received in the Point Pleasant election as follows: Fream-191; Ludwig-182; Marone-158; Mallon-137. There had been 54 applications for military ballots; 33 voters sent in their ballot, including three disputed ballots.[3] The count of the military ballots revealed the following votes for councilman: Fream-27; Ludwig-18; Marone-13; and Mallon-4.[4]

I.
Before the Law Division, Mallon challenged the legality of certain votes, including those cast by Gene Berkeley and his wife Donna. He asserted that the Berkeleys were not registered voters of Point Pleasant, and that in any event Gene Berkeley was no longer a Borough resident. The testimony was that as a result of marital problems, some time in March 1988, a restraining order had issued which prohibited Gene from returning to the marital residence. He then moved in with a friend at another location in Point Pleasant. His wife remained at the former marital abode. For some two and one-half to three years Gene had worked for the Borough of Point Pleasant Public Works Department, and at the time of trial he had been working for a year and a half with the Borough Recreation Department. In May 1988, the Berkeleys *256 reconciled and moved to a friend's home in Bricktown. The Berkeleys testified that this was only a temporary address since they would be required to leave sometime in September 1988. The reconciliation was unsuccessful. In late June 1988 Donna returned to the former marital residence in Point Pleasant. Except for the two month period in Bricktown, Donna had resided for her entire life at the Point Pleasant residence. Her "Permanent Registration and Voting Record" showed that she had reregistered under her married name in March 1985 and voted in the Point Pleasant general and primary elections in 1986 and 1987.
Gene later moved back into Point Pleasant to a Hollywood Boulevard address where he stayed until September 1988 when he rented a room at a different location in the neighboring Borough of Point Pleasant Beach. He was living at the rooming house on the day he voted in the election. He testified that although he had not been living at the former marital residence since March 1988 he considered that his legal address and signed an affidavit at the polling place to that effect on election day. Cf. N.J.S.A. 19:31-11b. Since 1985 Gene had been a registered voter living at the marital residence. He voted in the general and primary elections thereafter. He also testified that he considered all other addresses where he resided since March 1988 as temporary arrangements during a trial separation with his wife.
The judge concluded that the Berkeleys each possessed the necessary qualifications to cast their votes in the Borough's general election and were entitled to vote there as residents of Point Pleasant.[5] See Application of Langbaum, 201 N.J. Super. *257 484, 491 (App.Div. 1985). See also State v. Benny, 20 N.J. 238, 252-255 (1955); State v. Atti, 127 N.J.L. 39, 41-42 (Sup.Ct. 1941), aff'd 128 N.J.L. 318 (E. & A. 1942). Compare N.J.S.A. 19:4-1. In In re Petition of Hartnett, 163 N.J. Super. 257 (App.Div. 1978), we stated:
And where a person has and maintains a permanent home in the voting district he has the right to vote in that district despite his temporary absence therefrom, provided that he does not vote elsewhere and the factual context reveals his intention to return to that home as his permanent abode. [Citations omitted]. [163 N.J. Super. at 263].
The evidence was sufficient to support the judge's finding that it was Gene's clear intent to maintain Point Pleasant as his home and to retain the only voting domicile that he had ever established even during a temporary relocation necessitated by a trial separation. See Rova Farms Resort v. Investors Insurance Co., 65 N.J. 474 (1974).
In addition, the judge found that the Berkeleys' failure to file a change of residence notice as required by N.J.S.A. 19:31-11a, after having moved to Bricktown for two months, did not make their votes illegal. There was sufficient evidence to demonstrate that the temporary move had not effectively withdrawn their voting registration and that there was no need to reregister. Even if they had been required to file a change of residence notice under N.J.S.A. 19:31-11a, the judge appropriately concluded that any failure to do so was a "mere irregularity" which did not void their votes once they had been cast. Wene v. Meyner, 13 N.J. 185, 196 (1953); Friends of Jim Usry v. Matthews, 187 N.J. Super. 176, 179-180 (App.Div. 1982). Hence, the judge properly refused to void the votes of the Berkeleys. We need not determine whether they might also have been permitted to vote in accordance with N.J.S.A. 19:31-11b.

II.
The judge also considered challenged absentee ballots for the following six individuals: James Martin Webb, Vincent J. Craparo, *258 Sr., Gregory Allen Shreeves, Linsley E. Wildeman, and Walter and Patricia Shreve. Each of these individuals had applied to the Ocean County Clerk for an absentee ballot. When received by the County Clerk's office, each application was marked at the top in handwriting with identification number 835, designating a ballot to be sent for the Point Pleasant election. An absentee ballot for the general election was subsequently sent to each of them. The completed ballot was thereafter returned to the County Clerk's office and was counted in the total vote.
At trial, it developed that James Webb was in the military, and stationed in Key West, Florida at the time of the election. He used a "Federal Postcard Registration and Absentee Ballot Request" form to apply for a military absentee ballot. Although his application indicated his permanent domicile as Bricktown (he was born in Point Pleasant), Webb somehow received and returned an absentee ballot for the Point Pleasant election. Although he could not clearly remember all the names on his absentee ballot, Webb knew for a fact that he voted for all the Republican candidates listed. He also testified that his intent was to vote in Bricktown, not in Point Pleasant.
An Ocean County Board of Elections supervisor testified as to the procedure for processing absentee ballot applications.[6] Upon receipt by the County Clerk the application is checked for accuracy by keying the information into a central computer which verifies whether the person is registered in the district so that a proper absentee ballot can be sent out. As a Bricktown resident, Webb should have received a Bricktown ballot, not one for Point Pleasant.
*259 The judge concluded that Mallon, the contestant, carried his burden of showing not only that the Webb vote was illegal as to the Point Pleasant candidates, but that his illegal vote was cast for Fream. See N.J.S.A. 19:29-1e. Thus, Fream's total vote count was reduced by one vote.
In the case of Vincent Craparo, the evidence showed that he had filed a civilian absentee ballot application indicating Jackson, New Jersey as his residence. Although Craparo had lived in Point Pleasant, he moved to Jackson in March 1988. Despite his listing of a Jackson address, Craparo received an absentee ballot from the County Clerk which bore the Point Pleasant code 835 since he had not filed a change of address form prior to the November 8th election. Moreover, the sample ballot mailed to his former address had not been returned undelivered because he continued to share a Point Pleasant Borough post office box with his daughter. Craparo testified that when he received the absentee ballot he examined it and recalled that the bottom portion involved municipal elections in Point Pleasant. Initially, Craparo stated that he recalled voting for Mallon and another person for councilman as he considered these individuals to be "new blood." On cross-examination, he stated, however, that he could not be absolutely positive for whom he voted.
The judge reasoned that Craparo had established a new domicile in Jackson, and thus had voted illegally in the Point Pleasant municipal election. Nevertheless, the judge found that Fream had failed to sufficiently establish that Craparo voted for Mallon. Since Fream had counterclaimed, alleging generally that illegal votes were received on behalf of Mallon, the burden of proof with respect to the Craparo application was placed on Fream. Since the judge concluded that it could not be definitely established for whom Craparo had voted, no further adjustment in the vote tally resulted.
The challenges by Mallon to the absentee ballots cast by Shreeves, Wildeman, and Walter and Patricia Shreve were *260 based solely on the information appearing on the absentee ballot applications. Shreeves had submitted a combined military registration and absentee ballot request which showed Point Pleasant as his birthplace, but listed his voting address as Toms River and a military address in Newport, Rhode Island. However, Shreeves was sent an absentee ballot for Point Pleasant.
Wildeman's application, as spouse of a member of the Armed Forces, was also a combined postcard registration and absentee ballot request. She gave a Point Pleasant residence address and a mailing address at Barksdale Air Force Base, Louisiana. Wildeman was sent a Point Pleasant absentee ballot. However, a supervisor with the Ocean County Board of Elections testified that although Wildeman gave a Point Pleasant mailing address, the residence was actually located on a portion of the street in a Bricktown voting district. Hence, a Point Pleasant absentee ballot was improper.
No testimony was presented as to how either Shreeves or Wildeman had voted. There was no showing that any attempt had been made to contact either of these individuals or obtain their testimony. The trial judge concluded that although it was uncontroverted that the votes of these individuals were illegal, since it was unknown for which municipal council candidate any of these four individuals had voted, the final tally of the votes could not be changed. The judge correctly applied the law in coming to this conclusion. See In re Petition of Hartnett, 163 N.J. Super. 257, 266 (App.Div. 1978).
Finally, the judge rejected the claim that the applications of Walter and Patricia Shreve should be rejected on the basis that their signatures were not acknowledged before an officer authorized to take an oath. The judge correctly concluded that since each had signed his or her own application, no notarization was required, and as legal residents of Point Pleasant the ballots were properly coded. See N.J.S.A. 19:57-4 and 5. Thus, there was no deficiency in their applications or ballots.
*261 In addition to the aforementioned challenges, Mallon and Fream had each contested the validity of two other absentee ballots, one cast for each candidate, claiming that those ballots contained distinguishing marks in violation of N.J.S.A. 19:16-3 and 4, and should therefore be declared null and void. Mallon contended that the placing of an asterisk next to each of the candidates voted for on the absentee ballots in question clearly identified and distinguished those ballots so that they should have been deemed invalid. The judge rejected these challenges, saying:
R-1 first came to the attention of the court in connection with the application of the petitioner for a recount. At that time, the court viewed the ballot and found that the chad that appeared next to the candidate's name is entirely blacked out by a ballpoint pen rather than removed. All of the voter's choices on that ballot were marked in the same manner. In that proceeding, the court inquired as to whether or not the Board of Elections had voted on whether to accept this ballot, and was informed that they did not. The court then directed that the board so vote, which they did, and it was reported that they unanimously voted to accept this ballot and the same was counted in the final recount.
P-1, on the other hand, also contains ballpoint pen markings. In this case it is in the form of an asterisk mark next to the chad which is in this instance actually removed. This particular ballot was not brought to the attention of the court during the recount and was included in the official tally submitted both before and after the official recount.
The judge noted that the election board had not rejected these ballots and had not made any affirmative finding that these ballots had been improperly marked. He found that the two ballots had not been marked to identify or distinguish them, and thus they were not voidable under N.J.S.A. 19:16-3(b) or 19:16-4.
This is not a case where the issue is whether a proper mark was made in the box provided next to the names of each candidate. Hence, cases such as In re Sadlon, 88 N.J. Super. 37 (App.Div. 1965) and Petition of Wade, 39 N.J. Super. 520 (App.Div. 1956), are inapposite.
N.J.S.A. 19:16-3 sets forth the procedure for the district board of elections to follow in counting ballot votes. Section b of this statute states that if upon canvassing the ballots the district board or the county board find that marks have been *262 placed next to a candidate's name with the intent to identify or distinguish the ballot then that ballot will not be counted and will be declared void.
N.J.S.A. 19:16-4 also deals with the effect of distinguishing marks on a ballot, and provides in pertinent part:
No ballot which shall have, either on its face or back, any mark, sign, erasure, designation or device whatsoever, other than is permitted by this Title, by which such ballot can be distinguished from another ballot, shall be declared null and void, unless the district board canvassing such ballots, or the county board, judge of the Superior Court or other judge or officer conducting the recount thereof, shall be satisfied that the placing of the mark, sign, erasure, designation or device upon the ballot was intended to identify or distinguish the ballot.
The judge recognized that the absentee ballot provisions of the election laws should be construed liberally so as not to deprive voters of their franchise for technical reasons. N.J.S.A. 19:57-3; see Kilmurray v. Gilfert, 10 N.J. 435, 440 (1952); Application of Langbaum, supra (201 N.J. Super. at 489). A judge may not speculate as to the voter's intent in order to validate a ballot marked contrary to that permitted by the statute. In re Sadlon, supra (88 N.J. Super. at 40). However, not every mark on a ballot will cause it to be invalidated. In re Keogh-Dwyer, 85 N.J. Super. 188, 193 (App.Div. 1964), rev'd on other grounds 45 N.J. 117 (1965).
Here, the absentee ballots that were used were designed with punch-outs to be counted by machine, so that no marks were necessary on the ballot. This does not preclude a voter from making a mark as a protection or reminder. Moreover, the language of the absentee ballot contained the statement: "To protect your vote it is against the law for anyone except you, the voter, to open, mark, inspect or seal this ballot." (Emphasis supplied). The envelope included a form "Instructions to Civilian Absentee Voter" with a heading "Marking your Ballot (1) Mark the ballot for the candidate of your choice, (2) Insert complete ballot in the envelope, (3) Seal the envelope (do not detach the certificate)." Hence, the voter would not necessarily understand that he was not supposed to put any mark on *263 the ballot. Indeed, the first instruction on removing the "chad" appeared in additional forms included with the ballot and indicated that the voter was to "punch out the cross mark on the right of your choice." The instructions did not indicate that no mark would be permitted on the ballot and that a mark would void the ballot. The ballot merely contained the instruction that if you erroneously punch the ballot card it is to be returned to the County Clerk in exchange for a new one.
Thus, the judge appropriately found that there was nothing unusual or unreasonable in a person marking an absentee ballot with asterisks or black marks to either avoid punching out the wrong hole on the computerized ballots or to insure that there was no mistake with respect to the punching out of a "chad." The trial judge correctly noted:
Nowhere in these instructions is it indicated that no marks on this ballot will be permitted and that the same will void the ballot. On the contrary, the only instructions on the ballot itself indicated that if you erroneously punched the ballot card, return it to the County Clerk and obtain a new one.
"It is only a mark that was placed [on the ballot] by voters with the intention to identify or distinguish the ballot that so voids the same." In re Keogh-Dwyer, supra (85 N.J. Super. at 193). There was insufficient basis to conclude that these ballots were marked so as to be identified or distinguished in any prohibited fashion. At best, the mark only emphasized what was evident  the vote cast. Accordingly, these absentee ballots were properly included in the tally of votes.

III.
With respect to whether malconduct existed, the judge considered the claim that the vote of Dr. Thomas Jordan, a qualified Point Pleasant voter, was improperly rejected as he attempted to vote by leaving his absentee ballot at the polls. An attempt to vote at the polls by way of absentee ballot does not comply with the statutory mandates. N.J.S.A. 19:57-26 allows the county boards of election to receive absentee ballots prior to the time designated for closing of the polls in order to be counted. However, N.J.S.A. 19:57-28 prohibits a person *264 who has applied for and obtained a civilian absentee ballot from voting at the polling place in his election district on the day of the election. The election workers properly rejected Jordan's vote at the poll and instructed him to deliver his vote to the election board before the polls closed. See Mulcahy v. Bergen County Board of Elections, 156 N.J. Super. 429, 437 (Law Div. 1978). There was thus no proof that any legal voter had been improperly rejected at the polls. Moreover, we reject as without merit Mallon's argument that as an appointed representative of the County Board of Elections pursuant to N.J.S.A. 19:6-1, the district board to which Dr. Jordan brought his absentee ballot was authorized to accept it when presented. Voting by absentee ballot is a privilege and not a right and the Legislature is empowered to enact restrictions and limitations thereon. See DeFlesco v. Mercer County Board of Elections, 43 N.J. Super. 492, 495-496 (App.Div. 1957); Mulcahy v. Bergen County Board of Elections, supra (156 N.J. Super. at 433-434).
Although the judge found that four of the disputed absentee ballots cast in the November 8, 1988 general election were illegal under N.J.S.A. 19:29-1e for lack of residence in the particular voting district in the county, he ruled that such invalidity could not affect the election result since it was not established for whom three of these ballots had been cast. Nevertheless, the judge stated that he had "serious questions as to the procedures followed" regarding these absentee ballots.
Essentially, the trial judge here concluded that there were not sufficient irregularities "to change the result" under N.J.S.A. 19:29-1e. However, he then considered the very same election challenges, including the same absentee ballots, under N.J.S.A. 19:29-1a, and concluded that in sum they constituted malconduct sufficient to "challenge the result." In voiding the election result, the judge found that certain irregularities existed in the voting and absentee ballot procedures of both the election workers and election officials involved in the Point Pleasant general election of November 8, 1988 and that those *265 irregularities constituted malconduct sufficient to "challenge the election" results for Borough councilman between Fream and Mallon. The judge thus ordered a new election.
The County Clerk, intervening on this appeal, argues in part that N.J.S.A. 19:29-1a does not apply to him, but by its terms applies only to the members of any district board or members of the board of county canvassers. However, while the County Clerk is not a member of the district board, see N.J.S.A. 19:6-2, he is designated as Clerk of the County Board of Canvassers. N.J.S.A. 19:6-26. Hence, we need not decide the appeal based on whether N.J.S.A. 19:29-1a includes the County Clerk's conduct.
N.J.S.A. 19:57-1 et seq. sets forth procedures for utilizing absentee ballots. Under N.J.S.A. 19:57-10 and 24, the County Clerk and the County Board of Elections have duties to ascertain whether an applicant for an absentee ballot is a qualified voter by comparing the signature and information contained on an application with that appearing on the permanent form prior to issuing the voter an absentee ballot and checking other available information.
While the election laws regarding absentee ballots are to be liberally construed to avoid disenfranchisement (N.J.S.A. 19:57-3), voting by absentee ballot is not an absolute right, but is considered a privilege which is subject to proper legislative limitation. Application of Langbaum, supra (201 N.J. Super. at 489); In re Petition of Battle, 190 N.J. Super. 232, 236 (App.Div. 1983), mod. 96 N.J. 63 (1984); DeFlesco v. Mercer County Board of Elections, supra (43 N.J. Super. at 495); Mulcahy v. Bergen County Board of Elections, supra (156 N.J. Super. at 434). See 2 Antieau, Municipal Corporation Laws, § 17.19 at 568.1 (1973). The maintenance of the integrity of the elective process is a primary concern. In re Petition of Battle, supra (190 N.J. Super. at 236-237).
Of the four absentee ballots disputed on the ground of residence, three were requests for military absentee ballots (in *266 one case by a spouse), which also included initial registration forms. Because these voters were not previously registered in Ocean County, there were no permanent record cards available for a comparison of signatures, and hence that portion of N.J.S.A. 19:57-10, which required comparison of the signature with the signature on the permanent registration form, could not be utilized. Consequently, there was no basis on that ground for disapproving any of those three absentee ballot applications under N.J.S.A. 19:57-10, or for referring them to the Superior Court for determination. See N.J.S.A. 19:57-24. All the applications showed on their face a claim of residency in Ocean County. The mistake made related to the correct municipality of residence in the county. In particular, one application had listed a Point Pleasant address, although the house was across the municipal boundary and in Bricktown.
As previously indicated, the information contained in each absentee ballot application was checked against the information in the County Clerk's centralized computer. Thus, it is obvious that the three absentee ballot applications which were on initial registration forms would not have been in the computer. It is true that on the face of two of the military applications submitted (Webb and Shreeves) it would appear that the applicants had given different voting addresses than Point Pleasant, and that this should have resulted in a different code being marked on the ballots to key into subsequent distribution of the absentee ballots.[7] In the case of Craparo's civilian absentee ballot application, he had indicated Jackson Township as his residence.
The trial judge concluded that with respect to these four absentee ballot applications the County Clerk had failed to comply with N.J.S.A. 19:57-10, which not only required a comparison of signature, but a check of "any other available information," to determine if the "applicant is a voter qualified *267 to cast the ballot in the election in which he desires to vote ..." and N.J.S.A. 19:57-24, which specifies certain duties of the County Board of Elections after receiving civilian and military absentee ballots. Section 24 of the absentee voting law states:
The county board of elections shall, promptly after receiving each civilian absentee ballot, remove the inner envelope, containing the ballot, from the outer envelope and shall compare the signature and the information contained in the flap of the inner envelope with the signature and information contained in the respective request for civilian absentee ballots. ...
The county board of elections shall, promptly after receiving each military service ballot, remove the inner envelope, containing the ballot, from the outer envelope and ascertain through the commissioner of registration whether or not the name of the person, whose name appears following the certificate on the flap of said inner envelope, has been certified by the county clerk to the commissioner of registration of the county as a person to whom a military service ballot, to be voted at the election at which it is intended to be voted, has been forwarded pursuant to this act.
The county board shall investigate the qualifications of a military service voter under this act by comparison of the contents of said certificate with the information appearing upon the application for said military service ballot, including the signatures thereon when the military service voter's signature appears upon said application, and by comparison with the military records of the State when deemed desirable.
* * * * * * * *
Disputes as to the qualifications of military service or civilian absentee voters to vote or as to whether or not or how any such military or civilian absentee ballot shall be counted in such election shall be referred to the Superior Court for determination.
Finding that neither the County Clerk nor the Board of Elections had effectively carried out the checks required by N.J.S.A. 19:57-10 and 19:57-24, and that there were other irregularities in connection with the voting by the Berkeleys, the trial judge reasoned that there was malconduct sufficient to challenge the result under N.J.S.A. 19:29-1a.
N.J.S.A. 19:29-1 provides in pertinent part:
The nomination or election of any person to any public office or party position, or the approval or disapproval of any public proposition, may be contested by the voters of this State or of any of its political subdivisions affected thereby upon 1 or more of the following grounds:

*268 a. Malconduct, fraud or corruption on the part of the members of any district board, or of any members of the board of county canvassers, sufficient to challenge the result;
* * * * * * * *
e. When illegal votes have been received, or legal votes rejected at the polls sufficient to change the result; ...
It is helpful to again illustrate the contrast between illegality of votes and malconduct. In a challenge based on illegal votes, the contestant has "not only the burden of showing that illegal votes were cast in number sufficient to change the result if they had in fact been cast for the contestee, but also the burden of showing, to the extent possible under the circumstances, for whom the illegal votes were cast." Application of Murphy, 101 N.J. Super. 163, 167 (App.Div. 1968), certif. den. 52 N.J. 172 (1968). See In re Bonsanto's Application, 171 N.J. Super. 356, 361 (App.Div. 1979); In re Petition of Hartnett, supra (163 N.J. Super. at 265-266); In re Application of Moffat, 142 N.J. Super. 217, 224 (App.Div. 1976), certif. den. sub nom. Princeton Township v. Bleiman, 71 N.J. 527 (1976).
A respectable argument can be made for the view that where there are a sufficient number of illegal votes, if deducted from the winner's tally, to "change the result" the challenger should not also have the burden of proving that they were cast for his opponent. The case law, however, is well-settled, as recognized by the trial judge. Moreover, the Legislature is presumed to be aware of this consistent interpretation of the election laws since Murphy and may be deemed to have acquiesced therein. See In re Keogh-Dwyer, 45 N.J. 117, 120 (1965); F.M.C. Stores Co. v. Borough of Morris Plains, 195 N.J. Super. 373, 389 (App.Div. 1984), aff'd 100 N.J. 418 (1985); Essex County Welfare Bd. v. Perkins, 133 N.J. Super. 189, 198 (App.Div. 1975), certif. den. 68 N.J. 161 (1975).
It is axiomatic that elections should not lightly be set aside and the will of the electorate defeated by mere irregularities. Wene v. Meyner, supra (13 N.J. at 191-192); Kilmurray v. Gilfert, supra (10 N.J. at 440); Petition of Hartnett, supra *269 (163 N.J. Super. at 265 n. 3). This is particularly so where, as here, there is no suggestion of fraud, duplicate voting, or intent by any voter to corrupt the election. See In re Petition of Hartnett, supra (163 N.J. Super. at 265-266). Hence, we see no basis to disturb the long-standing rule regarding illegal votes.
While the burden of proof is on the contestant in a section e contest to establish not only the illegality of a vote, but in addition how the voter voted, an exception has developed in the case law where the challenger cannot establish to the extent possible under the circumstances for whom the illegal vote was cast. In re Bonsanto's Application, supra (171 N.J. Super. at 360). We interpret this to mean that it must be shown that it is not possible to locate the person who cast the illegal vote or, if located, to compel the voter under Evid.R. 31 to disclose how he or she cast the illegal vote. For that exception to apply, however, the challenger must show the exercise of reasonable diligence in attempting to find the challenged voter and that, despite such diligence, he or she could not be found. The exception cannot mean merely that it is impossible to determine how the person voted or the language of the statute requiring that it be "sufficient to change the result" (N.J.S.A. 19:29-1e) would have no meaning. The challenger has to carry both prongs of the burden established in Murphy and its progeny[8] and, in addition, prove that despite diligent effort the illegal voter could not be found or refused to disclose his vote. On this standard, Mallon did not carry his burden of proof.
The trial judge recognized that "mere irregularities" should not render an election void. Friends of Jim Usry v. Matthews, supra (187 N.J. Super. at 179). Although acknowledging that irregularities can be found in most elections, he felt that considering and weighing as a whole the irregularities in this *270 case, particularly in view of the closeness of the election, a new election was required.
In determining whether certain irregularities rise to a level which requires nullifying an election, this court stated in Sharrock v. Borough of Keansburg, 15 N.J. Super. 11, 17 (App.Div. 1951):
... the courts consider the nature of the irregularity, its materiality, the significance of its influence and consequential derivations in order to determine whether the digression or deviation from the prescribed statutory requisitions had in reasonable probability so imposing and so vital an influence on the election proceedings as to have repressed or contravened a full and free expression of the popular will....
We are admonished, in the absence of malconduct, not to overturn a concluded election unless the claimed irregularity has interfered with the full and free expression of the popular will, and has thereby improperly influenced the election result. In re Hackensack Recall Election, 31 N.J. 592, 595 (1960); Wene v. Meyner, supra (13 N.J. at 196). See also In re Clee, 119 N.J.L. 310 (Sup.Ct. 1938); Sharrock v. Borough of Keansburg, supra (15 N.J. Super. at 17); In re Smock, 5 N.J. Super. 495 (Law Div. 1949). Election laws are to be construed in such a way as to effectuate their purpose, and yet not deprive the voters of their franchise for purely technical reasons. Kilmurray v. Gilfert, supra (10 N.J. at 440); Application of Langbaum, supra (201 N.J. Super. at 489). For this reason mere irregularities in failing to comply with a procedural requirements will generally not be sufficient to void any votes. Wene v. Meyner, supra (13 N.J. at 196); Friends of Jim Usry v. Matthews, supra (187 N.J. Super. at 179-180); Petition of Hartnett, supra (163 N.J. Super. at 266).
It is only where the irregularities at an election are such that the court cannot with reasonable certainty determine who received the majority of the legal vote, that an election will be set aside. In re Bonsanto's Application, supra (171 N.J. Super. at 360); In re Application of Moffat, supra (142 N.J. Super. at 226); 3 McQuillin, Municipal Corporations, § 12.24 at 152. See also In re Application of Dorgan, 44 N.J. 440 (1965).
*271 Although an acknowledged "expansive" interpretation of "malconduct" was given by the Law Division in Magura v. Smith, 131 N.J. Super. 395, 399 (Law Div. 1974), and was relied on by the trial judge here, that definition is not binding on us. The judge concluded in Magura that malconduct was broad enough to include "a failure to follow affirmative statutory requirements and not `bad' or illicit conduct." Id. at 399. In Magura, there was a malfunction of the only voting machine at the subject polling place so as to preclude anyone from voting on the machine for the first hour and one-half of the election day. The judge stated that he considered it malconduct not only for the Board of Elections to have failed to promptly replace the inoperative voting machine, as required by statute, but also because it failed to supply paper ballots to be used when the machine was found not operative. However, the judge concluded that under the circumstances the errors were harmless and refused to set aside the election because the challenger had failed to show that at least 18 qualified voters (the margin of victory was 18) had been frustrated or prevented from casting their vote. Id. at 402.
Our review of the language of N.J.S.A. 19:29-1a leads us to a different interpretation of the term "malconduct" than that contained in the dicta in Magura purporting to define "malconduct." Hence, to that extent we overrule Magura. "Malconduct" is the first of three words in section a used to characterize prohibited actions of election officials. It is juxtaposed with "fraud" and "corruption." Hence, "malconduct" should be read in pari materia with those words even though the disjunctive is used. Red Bank Reg. Ed. Ass'n v. Red Bank Bd. of Ed., 151 N.J. Super. 435, 438 (App.Div. 1977), aff'd 78 N.J. 122 (1978); State v. DeMarco, 174 N.J. Super. 411, 414-415 (Law Div. 1980); Allstate v. Howard Savings Inst., 127 N.J. Super. 479, 494 (Ch.Div. 1974); 1A Sutherland, Statutory Construction (4th ed. 1985), § 21.14. The term "malconduct" is defined as "bad conduct; especially dishonesty in managing public affairs." *272 Webster's Third New International Dictionary (1971). Black's Law Dictionary (5th ed. 1979), contains the definition:
Malconduct. Ill conduct, especially dishonest conduct, maladministration, or, as applied to officers, official misconduct.
"Mal" is defined as "A prefix meaning bad, wrong, fraudulent; as maladministration, malpractice, malversation, etc." Ibid. Maladministration is defined in this same law dictionary as being used "interchangeably with misadministration, and both words mean `wrong administration.'" The Latin derivation of mal is "evil" or "bad." The malconduct referred to in N.J.S.A. 19:29-1a must result from a degree of gross negligence or inattention to duty tantamount to purposeful conduct such as fraud or corruption. Isolated acts of negligence or omission do not rise to the level of official malconduct.
In reviewing the grounds on which the trial judge concluded that there had been malconduct, it is obvious that he converted, on an insufficient basis, certain procedural irregularities into "malconduct." For instance, although the trial judge expressly found that the irregularities were "immaterial" with respect to the Berkeleys, who were legally entitled to vote, he later concluded that the County Clerk's failure to remove their voting record sheets from the registration books (see N.J.S.A. 19:31-15) should be considered as malconduct. Also, there apparently was some confusion at the polls among the election workers as to the handling of the Berkeleys' challenged votes. At best, there was a problem of communication and disagreement between the election workers as to who should have made the telephone call to the election board upon finding the Berkeleys' registration sheets tagged with a notice. The trial judge also questioned the procedure followed by the Point Pleasant election worker in only making one call to the clerk's office for both Gene and Donna Berkeley at the time Gene alone came to vote. No statutory procedure or regulating authority has been called to our attention regarding these procedures. Despite the "irregularities" associated with the Berkeleys' votes, we conclude *273 that alone or in combination they do not meet the standard of malconduct required under N.J.S.A. 19:29-1a.
As to the improper coding of Point Pleasant on the absentee ballot applications, we hardly find that these irregularities, conceded as errors by the County Clerk, rise to the level of "malconduct" sufficient to void the election. While there may be instances where a failure to comply with statutory provisions is so egregious that it should be considered malconduct, see Richards v. Barone, 114 N.J. Super. 243, 249-250 (Law Div. 1971), this is not such a case.
Moreover, the petitioner here had ample opportunity to attempt to prove whether illegal votes cast in the election for seats on the Point Pleasant governing body had been cast for the opposing candidate. The trial judge and the attorneys had been resourceful enough to employ a telephone conference on the record in contacting one member of the military, and ultimately ascertained his vote. Similar procedures were presumably available to contact the other individuals involved, all of whom were apparently in the United States. Modern communications provide ample methods to locate and speak to prospective witnesses. The record does not establish that diligent but unsuccessful efforts were made to contact those voters to obtain their testimony or statements.
Although Evid.R. 31 provides a privilege for a person not to disclose a vote, that privilege does not apply where the vote has been found to be illegal. N.J.S.A. 19:29-7; In re Application of Moffat, supra (142 N.J. Super. at 225); Application of Murphy, supra (101 N.J. Super. at 170). Here, petitioner clearly failed to carry his burden of establishing the person for whom the other challenged absentee ballots were cast, or that circumstances prevented such proofs. Petitioner likewise failed to carry his burden of proof in establishing malconduct with regard to the County Clerk's processing of the contested absentee ballot applications.
*274 Accordingly, the judgment of the Law Division is reversed. The matter is remanded for entry of a judgment confirming the election results based on the final tally, as adjusted. The cross-appeal is dismissed.
NOTES
[1] See R. 1:2-5(1) and 2:11-1(a).
[2] The order to show cause recited that it was to be served on all "parties" to the proceeding. However, it should have named all parties in interest, including the County Clerk and the Superintendent of Elections in order to give them adequate notice of the proceedings since the order entered required action by them. R. 4:67-2; R. 4:28-1(a)(1); and R. 1:5-1(a). See also R. 4:69-6(b)(1). Judgment or orders normally do not bind non-parties. State v. Redinger, 64 N.J. 41, 46 (1973); Biddle v. Biddle, 166 N.J. Super. 1, 7 (App.Div. 1979).
[3] These were for James Martin Webb, Linsley E. Wildeman and Gregory Allen Shreeves.
[4] Since only 62 votes were cast for the council positions out of the potential 66 votes, not all military voters had voted for the allowable number of candidates.
[5] The trial judge seemed to indicate that the burden of proof was on Fream, as the party relying on the Berkeleys' continued residence within the Borough, to establish the legality of their votes. However, the burden to prove that their votes were invalid was on Mallon who was challenging the election of Fream. In re Application of Moffat, 142 N.J. Super. 217, 224 (App.Div. 1976), certif. den. sub nom. Princeton Township v. Bleiman, 71 N.J. 527 (1976).
[6] We are not advised of the total number of absentee ballot applications received by the Ocean County Clerk or the total number of absentee ballots received for the entire County of Ocean in the November 8, 1988 election. However, counsel for the County Clerk represented at oral argument that the number approximated 10,000.
[7] The application of Wildeman (spouse of a member of the military) indicated a Point Pleasant address, although the County's records showed that her home was located in a Brick Township voting district.
[8] See, e.g., In re Bonsanto's Application, supra; In re Petition of Hartnett, supra; In re Application of Moffat, supra.