**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2607-22

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY,

     Plaintiff-Appellant,

v.

LALLYGONE LIMITED
LIABILITY COMPANY,

     Defendant-Respondent.

_____

          Argued January 17, 2024 – Decided January 25, 2024

          Before Judges Haas and Gooden Brown.

          On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0775-23.

          Lawrence F. Walker argued the cause for appellant (Cozen O'Connor, PC, attorneys; Lawrence F. Walker, on the briefs).

          Neal A. Thakkar argued the cause for respondent (Sweeney & Sheehan, PC, attorneys; Denise M. Montgomery, of counsel; Peter P. Sanchez, on the brief).

PER CURIAM

Plaintiff New Jersey Manufacturers Insurance Company (NJM) appeals from the Law Division's April 21, 2023 order granting defendant Lallygone Limited Liability Company's (Lallygone's) motion to dismiss NJM's complaint seeking to recover monies NJM previously paid to its insured, Efmorfopo Panagiotou (the Insured).  We affirm.

I.

The facts are not in dispute.  The Insured owned a home in Montvale and obtained a homeowners insurance policy from NJM.  In February 2022, he and Lallygone entered into a contract under which Lallygone agreed to make alterations to the detached garage on the property.  The Insured paid Lallygone a $22,250 deposit, which represented 50% of the $44,500 contract price.  The Insured made these payments through PayPal.

Lallygone purchased materials and paid subcontractors before beginning work on the project on March 21, 2022.  Nine days later, the garage collapsed while one of the subcontractors was removing the existing concrete slab inside the garage.

The Insured thereafter filed a claim with NJM, which investigated the matter.  "[A]s subrogee of" the Insured, NJM sent a letter to Lallygone "relative

to a fire loss[1] that occurred" at the property.  The letter informed Lallygone that its purpose was to "place [Lallygone] on notice of the potential for a subrogation lawsuit" and the letter "should be immediately forwarded to [Lallygone's] liability insurance carrier/attorney for review."

On May 19, 2022, the Insured disputed the $22,500 deposit payment through PayPal and represented that the "item" he purchased was "defective or not as described."  As a result, PayPal withdrew the funds from Lallygone's account and returned them to the Insured's account.

Thereafter, NJM "paid more than $187,000 in damages" to the Insured as a result of the garage collapse.[2]

On October 6, 2022, Lallygone filed a complaint against the Insured in the Special Civil Part.  Count one alleged breach of contract.  Count two alleged unjust enrichment and asserted the Insured had not paid for any of the work done by Lallygone.  Lallygone's complaint stated that "[a]fter the collapse of the

---

[1]  There is no other reference to a "fire loss" in the record.

[2]  The specific amount NJM paid to the Insured, and the date on which it was paid, are unclear from the record.  NJM states in its brief that it "paid the insured $185,286.10 as compensation for the property damage . . . on or before September 28, 2022" but NJM cites only to its complaint as support for this statement.  The complaint does not contain this precise figure, referring only to the "more than $187,000" paid by NJM to the Insured.  Nor does the complaint state when the payments to the Insured were made.

garage, [the Insured] filed an insurance claim with his homeowner's insurance carrier, who subrogated and/or resolved the claim with the insurance carriers for the respective contractors." The complaint certified pursuant to Rule 4:5-1 that "the claims raised herein are not the subject of any other action or arbitration inasmuch as the parties here are not parties in any other action involving the claims herein."

On November 19, 2022, the Insured, who was represented by an attorney, answered Lallygone's complaint and filed a counterclaim. In the answer, the Insured admitted that he withdrew the funds in PayPal following the collapse of the garage. Count one of the Insured's counterclaim alleged breach of contract, and stated that Lallygone "failed to properly engineer the garage"; failed to shore up the garage prior to beginning any renovations; and otherwise failed to perform the contracted work substantially free from defects in workmanship and in a good workmanlike manner.

Count two alleged violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -2.13, and stated that Lallygone misrepresented the quality of the work to be performed, the timeline for completion of the work, and that Lallygone and/or its agents caused the garage to collapse, all of which resulted in damages to the Insured. Finally, count three of the counterclaim alleged fraud, and stated that

4

Lallygone knowingly or recklessly concealed the condition of the garage "in order to induce [the Insured] to retain their services."

In his pleading, the Insured admitted that the insurance claim with NJM "has been resolved." The Insured's counsel similarly certified under Rule 4:5-1 that there were no other pending matters and that there were no other parties who should be joined "because of potential liability to any party on the basis of the same transactional facts."[3]

The Special Civil Part conducted a two-day bench trial, which began on January 12, 2023. George Nader, identified as "the Principal of Lallygone," testified on Lallygone's behalf about the terms of the contract between Lallygone and the Insured as well as the expenses that Lallygone incurred because of taking the job and performing the necessary work prior to the collapse of the garage. Nader testified on cross-examination that Lallygone used all the supplies it bought prior to the collapse of the garage. Nader also testified as to the sequence at which the work was performed.

The Insured testified on his own behalf and corroborated Nader's testimony as to the scope of the work Lallygone performed. The Insured testified that he was not present when the garage collapsed and was not sure

---

[3] Lallygone filed an answer to the counterclaim.

what caused it to collapse at the time. When asked about his counterclaims, the Insured offered little evidence in support, and instead relied on his own observations and his limited experience as a contractor. The Insured did not offer expert testimony as to why the garage collapsed, and instead relied solely on the fact that it collapsed as evidence that Lallygone committed consumer fraud.

On January 13, 2023, the trial court found for Lallygone and awarded damages of $9,151.76 because the Insured failed to compensate Lallygone for the cost of the materials and workmanship prior to the collapse of the garage. In an oral decision on the record, the court found that Lallygone did not commit a violation of the Consumer Fraud Act as alleged in the Insured's counterclaim. In part, the court did not find "ascertainable loss" because at that point the Insured had not yet "paid a penny to Lallygone." Specifically, the court noted that it did not have "a scintilla of evidence of damages other than storage and . . . I do not have any unlawful conduct or any unlawful conduct that resulted in the ascertainable loss." Accordingly, the court dismissed the Insured's Consumer Fraud Act claim.

The court also found there was no competent evidence in the record as to what caused the garage to collapse, finding that it was "a dilapidated structure

that needed a lot of work and the mere fact that that was not successful does not mean that [Lallygone] did anything wrong," particularly in the absence of any expert testimony from the Insured as to the potential cause. Therefore, the court dismissed the Insured's counterclaim in its entirety.

## II.

On February 8, 2023, NJM filed a complaint in the Law Division as subrogee of the Insured against Lallygone and sought to recover all of the money it previously paid the Insured on his claim. The complaint consisted of three counts: count one for negligence, count two for violation of the Contractor's Registration Act, N.J.S.A. 56:8-136 to -167, and the Consumer Fraud Act, and count three for breach of contract, specifically, breach of the implied warranty to perform services in a workmanlike manner. In response, Lallygone filed a motion to dismiss the complaint under the principle of res judicata and the entire controversy doctrine based on the Special Civil Part's determination in its favor in the prior action between it and the Insured.

Following oral argument, the trial court granted Lallygone's motion and dismissed NJM's complaint with prejudice. In its thorough oral decision rendered on April 21, 2023, the court found that the Insured presented no evidence in the prior action "to substantiate that Lallygone failed to complete its

7

work or that the fact that the garage collapsed was indicative of Lallygone failing to have completed its work pursuant to appropriate standards and practices."  As a result, the Insured did not meet his burden of proof to sustain his claim that Lallygone violated the Consumer Fraud Act, or to sustain a cause of action against Lallygone for breach of contract or for fraud in connection to the work it completed.  Thus, the court found the Insured "prosecuted and lost the claims for breach of contract, consumer fraud and common law fraud, all of which stem from the same factual nexus of events related to the collapse of the garage."

The court also acknowledged that NJM brought a claim for negligence, which was not part of the Insured's counterclaim in the Special Civil Part, but found the addition of that claim was "not relevant to th[e] court's decision, as that negligence claim is all stemming from the same factual nexus and the same written contract between [the Insured] and Lallygone."  Finally, as to NJM's claims that it never received notice of the Special Civil Part action, the trial court highlighted that "it is the counterclaim which generated [the Special Civil Part's] decisions relating to contract, consumer fraud, common law fraud and theories of unjust enrichment and that counterclaim was instituted by [NJM]'s insured."

The trial court further found that the entire controversy doctrine barred NJM's complaint against Lallygone.  The court noted that this doctrine mandates

that "all parties involved in the litigation should at the very least present in that proceeding all their claims and defenses that are related to the underlying controversy." The trial court conducted an analysis of NJM's claims and the Insured's counterclaims and determined that because the "factual nexus of both actions [were] identical," the entire controversy doctrine was applicable and precluded NJM's claims. The court emphasized NJM's status as a subrogee of the Insured, and determined that NJM "stand[s] in the shoes" of the Insured, and that "[t]hey do not have any rights greater than that of their insured." The court reasoned that "failing to join claims as required by the entire controversy doctrine results in the preclusion of the claims" and dismissed the matter accordingly. This appeal followed.

III.

We begin by addressing the trial court's determination that NJM's claims against Lallygone were barred by res judicata. NJM argues that the trial court erred in dismissing the complaint under the doctrine of res judicata because it was not a party to the original proceeding in the Special Civil Part. NJM further contends that even if NJM were in privity with the Insured, application of the doctrine is inequitable because it did not have an opportunity to obtain a full and fair adjudication of its claims and because its claim for relief greatly exceeds

9

the Insured's claims. Lallygone asserts that NJM's status as a subrogee prohibits this action because the subrogor, the Insured, already litigated the same issues and a court found that the Insured was not entitled to recovery.

"The application of res judicata is a question of law[]" that we review "de novo." Walker v. Choudhary, 425 N.J. Super. 135, 151 (App. Div. 2012) (quoting Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 173 (App. Div. 2000) (first)); (quoting Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (second)). "Res judicata prevents relitigation of a controversy between the parties." Brookshire Equities, LLC v. Montaquiza, 346 N.J. Super. 310, 318 (App. Div. 2002). "The rationale underlying res judicata recognizes that fairness to the defendant and sound judicial administration require a definite end to litigation." Velasquez v. Franz, 123 N.J. 498, 505 (1991) (citing Restatement (Second) of Judgments § 19 cmt. a (Am. L. Inst. 1982)).

For res judicata to apply, there must be "(1) a final judgment by a court of competent jurisdiction, (2) identity of issues, (3) identity of parties, and (4) identity of the cause of action." Brookshire Equities, 346 N.J. Super. at 318. Application of the doctrine is "a question of law 'to be determined by a judge in the second proceeding after weighing the appropriate factors bearing upon the

issue.'" Selective Ins. Co., 327 N.J. Super. at 173 (quoting Colucci v. Thomas Nicol Asphalt Co., 194 N.J. Super. 510, 518 (App. Div. 1984)).

The parties do not contest that the causes of action and the issues here are identical to the Special Civil Part action, or that there was a final judgment in the Special Civil Part. However, NJM argues identity of parties does not exist, thereby rendering application of res judicata improper. "Judgment or orders normally do not bind non-parties." N. Haledon Fire Co. No. 1 v. Borough of North Haledon, 425 N.J. Super. 615, 628 (App. Div. 2012) (quoting In re Application of Mallon, 232 N.J. Super. 249, 254 n.2 (App. Div. 1989)). However, a judgment may be binding on a non-party "if their interests have been represented by a party." Ibid. (citing Morris Cnty. Fair Hous. Council v. Boonton Township, 197 N.J. Super. 359, 364-65 (Law Div. 1984)).

Lallygone asserts that as a subrogee, NJM can only recover as much as the Insured can recover, and that, because NJM "stands in the shoes" of the Insured as a subrogee, NJM is bound by the prior actions of the Insured. Lallygone argues that NJM's issue likely lies with its Insured, because the Insured is the party who brought the similar claims and ultimately lost on those claims, which all "stem from the same factual nexus and all relat[e] to the collapse of the garage." Lallygone's position is correct.

11

"[S]ubrogation is a device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it [and] . . . to serve the interests of essential justice between the parties." Culver v. Ins. Co. of N. Am., 115 N.J. 451, 455-56 (1989) (quoting Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 171 (1954)). "The doctrine is highly favored in the law." Ibid.

> In the insurance context, subrogation is a doctrine allowing the insurer to seek recovery from the party at fault, exercised after the insurer has indemnified its insured under the terms of an insurance policy. The doctrine is based on the principle that a benefit has been conferred upon the insured at the expense of the insurer and vests in the latter any rights the former may have had against a third party who is liable for the damages.
>
> [Palisades Ins. Co. v. Horizon Blue Cross Blue Shield of N.J., 469 N.J. Super. 30, 41 (App. Div. 2021) (quoting City of Asbury Park v. Star Ins. Co., 242 N.J. 596, 604 (2020)).]

Subrogation can arise in one of three ways, either through "(1) an agreement between the insurer and the insured, (2) a right created by statute, or (3) a judicial 'device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it.'" Id. at 42 (quoting Culver, 115 N.J. at 456).

"The fundamental principle of subrogation is that the subrogee's rights rise no higher than those of the subrogor[,]" and the right of subrogation turns entirely on "the merits of the subrogor's claim against the third party." Holloway v. State, 125 N.J. 386, 398 (1991). "The subrogee, which succeeds to the position of the subrogor, may recover only if the subrogor likewise could have recovered; the subrogee gains no additional rights and is subject to all defenses that were available against the subrogor." Id. at 396.

Applying these principles, we are satisfied that there is identity of the parties between the two actions because of NJM's status as a subrogee to the Insured. A subrogee clearly "steps into the shoes" of the subrogor and does not obtain any additional rights or privileges other than those available to the subrogor. Ibid.; see also City of Asbury Park, 242 N.J. at 605 (quoting Pellechia, 15 N.J. at 172 ("In subrogation cases, the insured's right to recovery against a third-party tortfeasor vests in the insurer, and the insurer 'steps into the shoes of the insured.'")).

This is precisely the case here. When the Insured brought his counterclaim and raised allegations of breach of contract, common law fraud, and violations of the Consumer Fraud Act, he initiated an action to recover costs associated with the collapse of his garage. Why the Insured and his counsel

13

raised these claims even though he had already made a claim to NJM and was compensated is not clear from the record. But the fact remains that the Insured raised these claims and tried them to a decision in a court of competent jurisdiction. Thus, NJM's subrogation interest was represented by its Insured and tried to a final decision on the merits in the Special Civil Part.

NJM next argues that the equitable grounds that are normally applied to the doctrine of collateral estoppel preclude the application of res judicata in this case. NJM asserts that the trial court erred by declining to give weight to its argument that it would be inequitable to find that it is bound by its subrogor's actions in the Special Civil Part action because it did not know about that proceeding. We disagree.

The doctrine of collateral estoppel, or issue preclusion, "is a branch of the broader law of res judicata which bars relitigation of any issue actually determined in a prior action generally between the same parties and their privies involving a different claim or cause of action." Selective Ins., 327 N.J. Super. at 173 (quoting Figueroa v. Hartford Ins. Co, 241 N.J. Super. 578, 584 (App. Div. 1990)). For collateral estoppel to apply, the party invoking the doctrine must show:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was

actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

[Id. at 173-74 (quoting In re Est. of Dawson, 136 N.J. 1, 20 (1994)).]

"Although collateral estoppel overlaps with and is closely related to res judicata, the distinguishing feature of collateral estoppel is that it alone bars relitigation of issues in suits that arise from different causes of action." Id. at 173 (citing United Rental Equip. Co. v. Aetna Life and Cas. Ins. Co., 74 N.J. 92, 101 (1977)). Indeed, collateral estoppel "requires a similar, yet less demanding, analysis than res judicata or claim preclusion." First Union Nat'l Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 352 (2007).

"In brief, [res judicata] applies to all claims growing out of the same facts that could have been brought, but [collateral estoppel] applies only to those issues that were actually litigated and decided." Watkins v. Resorts Int'l Hotel & Casino, 124 N.J. 398, 422 (1991). Under collateral estoppel, then, "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or

a different claim." Ibid. (quoting Restatement (Second) of Judgments § 27). The doctrine "is not subject to rigid application but may be applied after a careful assessment and consideration of all relevant factors both in support of and against its application." Selective Ins., 327 N.J. Super. at 174; see also Pace v. Kuchinsky, 347 N.J. Super. 202, 215 (App. Div. 2002) (citing that collateral estoppel "has its roots in equity, [and] will not be applied when it is unfair to do so").

On the other hand, res judicata is a legal, rather than an equitable doctrine. Velasquez, 123 N.J. at 513. As the Velasquez Court held, the doctrine of res judicata "serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case." Ibid. (quoting Federated Dep't Stores v. Moitie, 452 U.S. 394, 401 (1981)). Thus, "there is 'no principle of law or equity which sanctions the rejection by a . . . court of the salutary principle of res judicata.'" Ibid. (quoting Heiser v. Woodruff, 327 U.S. 726, 733 (1946)).

"Only in extraordinary circumstances has the Court departed from strict deference to res judicata principles." Ibid. "Such circumstances exist where the issue is purely one of law that affects a substantial public interest, and the decision would 'frustrate totally the essential purpose of a statute' and result in

16

inequitable administration of the law if not reconsidered." Id. at 513-14 (quoting Plainfield v. Pub. Serv. Elec. & Gas Co., 82 N.J. 245, 258-59 (1980)).

No such circumstances exist in this case. Here, the Insured raised the identical claims against Lallygone to recover damages stemming from the collapse of the garage. Under the doctrine of res judicata, the rejection of those claims by the Special Civil Part in the first proceeding closed the door on NJM from being able to recover on the same in the second proceeding because NJM is a subrogee to the Insured. As such, its interests can only rise to the level of the Insured. Holloway, 125 N.J. at 396, 398 ("The fundamental principle of subrogation is that the subrogee's rights rise no higher than those of the subrogor[,]" and the right of subrogation turns entirely on "the merits of the subrogor's claim against the third party.").

Thus, as the Insured's interest was tried to conclusion by the Insured himself, NJM cannot supersede those interests and assert its own on the same claims. As the Court in Velasquez, quoting the United States Supreme Court, stated:

> [W]e cannot be expected, for [a party's] sole relief, to upset the general and well established doctrine of res judicata, conceived in the light of the maxim that the interest of the state requires that there be an end to litigation—a maxim which comports with common sense as well as public policy. And the mischief which

would follow the establishment of precedent for so disregarding this salutary doctrine against prolonging strife would be greater than the benefit which would result from relieving some case of individual hardship.

[Velasquez, 123 N.J. at 514 (quoting Reed v. Allen, 286 U.S. 191, 198-99 (1931)).]

Accordingly, we affirm the trial court's dismissal of NJM's complaint against Lallygone under the doctrine of res judicata. In view of this determination, we do not address the court's alternative ruling that NJM's claims were barred by the entire controversy doctrine.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2607-22