190 N.J. Super. 232 (1983)
462 A.2d 1291
IN THE MATTER OF THE PETITION OF ALMERTH BATTLE FOR A RECOUNT OF THE ELECTION HELD NOVEMBER 2, 1982 FOR THE OFFICE OF TOWNSHIP COMMITTEE OF THE TOWNSHIP OF NEPTUNE, PURSUANT TO N.J.S.A. 19:28-1 ET SEQ., AND TO CONTEST THE ELECTION OF JOSEPH M. PEPE TO THE OFFICE OF THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF NEPTUNE, PURSUANT TO N.J.S.A. 19:21-1 ET SEQ.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 1983.
Decided June 9, 1983.
*233 Before Judges KING and McELROY.
Lawrence M. Lawson argued the cause for appellant (Lawson & Kapalko, attorneys).
William J. O'Hagan, Jr., argued the cause for respondent (Stout, O'Hagan & O'Hagan, attorneys).
The opinion of the court was delivered by McELROY, J.A.D.
This appeal requires interpretation of the election law pertaining to civilian absentee ballots and in particular, N.J.S.A. 19:57-37.1 and N.J.S.A. 19:57-23 as amended by L. 1981, c. 390 §§ 8, 11, effective January 6, 1982.
Petitioner-appellant Almerth Battle lost the November 2, 1982 election to a seat on the Township Committee of Neptune Township by 24 votes. A total of 9,961 votes were cast, 342 of these by absentee ballot. Petitioner received 4,453 votes, her opponent, Joseph Pepe, received 4,477. On her petition a recount was ordered by the court which revealed the vote count to have been accurate and a date was set for a hearing to determine petitioner's claim of illegality as to certain absentee ballots. At the court's request and prior to the hearing petitioner's counsel listed 74 ballots alleged to be illegal. Sixty-six of these were ballots where the alleged illegality was the absence on the outside envelope of the printed name and signature of the messenger who hand-delivered the ballot to the board of elections (N.J.S.A. 19:57-37.1) or a failure to record the name of the messenger by having the messenger sign "a record which the county shall maintain of all absentee ballots personally delivered *234 to it." N.J.S.A. 19:57-23. Eight other ballots were asserted to bear the same deficiencies and to contain other faults as well.
Although the petition filed with the court made general allegations of fraud the issue narrowed to whether a violation of either or both N.J.S.A. 19:57-37.1 and N.J.S.A. 19:57-23 in the delivery of an absentee ballot to the county board of elections creates a vote which is illegal and thus not countable in the election. The matter was so treated in the trial division by counsel for the parties and the court. At the hearing of petitioner's challenge to the 74 absentee ballots no evidence was taken. Instead, the judge entertained an oral motion for summary judgment by counsel for the successful candidate. Pepe conceded that petitioner could prove the questioned ballots failed to comply with the statutes above cited but argued that the statutes were merely directory and a violation of them gave no ground for declaring those votes invalid. After argument from both parties on that issue the judge dismissed the petition on the ground that he observed no legislative intent in the cited statutes to disenfranchise a voter who failed to comply with N.J.S.A. 19:57-37.1 which provides:
Delivery by person other than voter to county board or postal box
No person shall take an absentee ballot from a voter or other person having custody of it for the purpose of delivering it to the county board of elections or a postal box or post office, nor shall any voter permit any person to do so, unless the ballot is sealed in the outer envelope and the person who shall transport or deliver it first signs and prints his name on the outer envelope. No other person shall attempt to do any of the foregoing. [Emphasis ours.]
The portion we have italicized is clear, the onus is put upon the absentee voter to see that the person who carries the ballot to the county board first signs and prints his name before the voter releases his ballot to that messenger.
N.J.S.A. 19:57-23, in pertinent part, requires: "... At the time any person delivers a ballot to the county board, he shall sign a record which the county shall maintain of all absentee ballots personally delivered to it."
The operative part of the judge's oral decision was as follows:

*235 I'm not at all in a position to say that that irregularity which has been referred to by counsel as an illegality and I'm not going to argue with them there. It may very well be an apt description of someone if it were not to carry that description into some distinction as to outcome. Whether you call it an illegality or irregularity. I'm satisfied that under the purposes of this particular statute and the amendments thereto which were intended to protect the voter that it would be improper for this Court to interpret that purpose and all that's involved with it as being something that's going to disenfranchise the voter if someone else, the bearer or the person who is to keep the register, does not carry out their function to the letter. There are ways of dealing with that. It's something that I'm sure being the first time around there may very well be some shortcomings in that regard. I'm sure it will be dealt with and not be a problem in the future. Knowing the type of responsible persons we have in this county who are involved in the election process on both sides. But I find no basis whatsoever for invalidating those ballots which fail to identify the bearer on the envelope and fail to bear the signature or carry the signature of the bearer in the registry vote. While it is something that did not comply with the statute it is of such a nature as to without a showing that there has been tampering of that ballot not call for the setting aside of the vote or the ballot or the election process. If in fact we had a coalescence of the two I would think that the failure to comply here would be something that would go very strongly in terms of any showing of irregularity on a particular ballot that did not have the information required.
But where there is no evidence or hint of tampering with the individual ballots, and in the absence of these particular requirements of the signing of the envelope and the registry I will not disqualify the particular ballots in question. And in light of that and in light of the stipulation and understanding that otherwise without a ruling that it would cast aside those votes I will grant the summary judgment against the plaintiffs in the matter.
In our judgment, the judge erred in concluding as he did. The problem may be in the fact that the motion for summary judgment was permitted to be urged orally, on the date set for hearing of petitioner's challenges, without a notice of motion that it was to be brought and without the briefs mandated by R. 4:46-2, which would have given the court opportunity to more thoroughly consider this important issue. Petitioner complains of this hasty disposition and, in our view, with justification.
The sections of the election law to be considered are, as the trial court noted, the result of recent legislative amendment, effective January 6, 1982 and operative as to the absentee ballots for this November 2, 1982 election. Although, as the trial court observed, the amendments "were intended to protect *236 the voter" a review of the legislative history and the statements accompanying the amendments when proposed indicate, as will be demonstrated, that this legislation had another vital purpose directed to the overall integrity of the electoral process of utilizing absentee ballots. Moreover, although we agree that disenfranchisement of a voter is an end reasonably to be avoided, Wene v. Meyner, 13 N.J. 185, 197 (1953), it must be kept in mind that the statutory right to vote as an absentee is not an absolute right and is subject to proper legislative exception and limitation. Mulcahy v. Bergen County Bd. of Elections, 156 N.J. Super. 429, 433-434 (Law Div. 1978). There relying in part on this court's decision in DeFlesco v. Mercer County Bd. of Elections, 43 N.J. Super. 492, 495-496 (App.Div. 1957), Judge Petrella observed that absentee voting is "a privilege rather than a right, and its roots must come by way of legislative enactment since absentee voting did not exist at common law. See 2 Antieau Municipal Corporation Law, § 17.19 at 568.1 (1973)." Id. at 434. Although the legislative enactment here considered is to be liberally construed to effectuate the purpose of enabling a registered civilian absentee voter to cast his or her vote (N.J.S.A. 19:57-3), the manner and method by which this shall be accomplished is subject to the valid legislative concern that not only the voter but the process of exercising the vote be secure from the opportunity for fraud. In a decision this court endorsed, Judge Haines held certain absentee ballots void under the election laws as they existed in 1978. He observed:
Since the public election mechanism is entirely a statutory creation lacking any common-law antecedents, the judiciary must always seek to vindicate the perceived intent of the Legislature in the particular situation. Sharrock v. Keansburg, 15 N.J. Super. 11, 16 (App.Div. 1951). Thus, if the election statute "expressly declares that a specified irregularity shall nullify an election, the courts, irrespective of their views of the wisdom or serviceability of the requirement, uniformly respect the legislative declaration." Id. at 16-17. But if the statute is silent, the legislative will must be found and followed through careful analysis of the statutory language and expressed concerns of the Legislature. Often the label mandatory or directory is appended to the section of the election law implicated as a symbol of the court's determination of the legislative intent. If the section is characterized as one that is mandatory in nature, the ballot or election will be overturned; if the section is characterized as one that is *237 directory in nature, the ballot or election will be upheld. In re Smock, 5 N.J. Super. 495 (Law Div. 1949). But these are only labels  it is still the legislative intent that decides the result. Wene v. Meyner, supra, 13 N.J. at 196.
In DeFlesco v. Mercer Cty. Bd. of Elections, 43 N.J. Super. 492, 496 (1957), the Appellate Division listed the concerns that influenced the enactment of our absentee voting legislation. These concerns include a desire to preserve the enfranchisement of qualified voters, safeguard the secrecy of the ballot, deter fraud and achieve a prompt determination of the election. When the dispute focused on the manner in which the ballot itself was marked in In re Keogh-Dwyer, 85 N.J. Super. 188, 198-99 (App.Div. 1964), rev'd on other grounds. 45 N.J. 117 (1965), the Appellate Division emphasized the importance of not sanctioning methods of voting that "would open the door to possible fraud."
....
There is a close connection between the statutory delivery requirements and legislative concerns about fraud and secrecy. Fraud, in particular, is difficult to prove. The purpose of our statutes is to prevent fraud and preserve secrecy through strict procedural controls. A violation of these procedures, therefore, become very significant. Thus, the error here, unlike that in Wene v. Meyner, cannot be described as "unwitting omission of a formal requirement otherwise supplied in substance...." [In re Matter of Petition of Byron, 165 N.J. Super. 468, 473-475 (Law Div. 1978), aff'd o.b., 170 N.J. Super. 410 (App.Div. 1979), certif. den., 82 N.J. 280 (1979).]
Byron presented two consolidated cases, one contesting an election in Wrightstown, the other an election in Fieldsboro. Although there were assertions of fraud in affidavits filed with the court the judge declined to rely upon these statements. Rather he held that it was the opportunity for that invidious practice that the Legislature sought to prevent by the prescribed procedures for delivery and return of absentee ballots. Id. 165 N.J. Super. at 475.
In the Wrightstown case "certain candidates obtained and delivered applications for absentee ballots to the county clerk, who gave them the unmarked ballots for transmittal to the voters. These ballots found their way back to the board of elections by different routes, some by mail, some by hand delivery by candidates or others and some through the county clerk's office to which they had been returned by methods unknown." Id. at 471. The County Board of Elections rejected these absentee ballots, primarily on the ground that they were improperly delivered. The losing candidates sued contending *238 the ballots should have been counted in the final vote totals. Ibid.
In the Fieldsboro matter the board of elections counted 51 absentee ballots which "were issued on the basis of applications delivered to the clerk by an interested citizen, to whom in return, the unmarked ballots were delivered for transmittal to the voters. Sixteen or 17 of these unmarked ballots were not transferred directly to the voters, but were given to the initially successful mayoralty candidate for delivery to the voters. All of the ballots were returned to the board of elections by mail." Ibid.
In holding the questioned ballots invalid and not to be counted Judge Haines ruled that proof of actual fraud was not necessary and that the paramount legislative intent to prevent the possibility of fraud required the questioned absentee ballots be voided. He held:
In short, two of the vital concerns of the Legislature in enacting absentee voting legislation  preservation of the secrecy of the ballot and prevention of fraud  were placed in jeopardy by the procedure adopted in these cases. The importance of vindicating these interests outweighs any countervailing concern over the disenfranchisement of voters. Furthermore, in both cases a sufficient identification of the offending ballots is available to permit their suppression and obtain firm election results. Consequently, the court has concluded that the intent of the Legislature will best be served by voiding the ballots. If the only remedy available was the ordering of new elections, the intent of the legislature would have to be reassessed; proof of actual fraud may be required before that drastic result may occur. Since this problem is not present here, its solution must await another case. [Id. at 476.]
At about the time of the decision in Bryon a movement took form to revise and to tighten the procedures for utilizing absentee ballots and to further the dual legislative concerns, noted in the above quotation, to preserve the secrecy of such ballots and, equally, to prevent fraud. The State Commission of Investigation held hearings on December 14 and 15, 1978. Chairman Rodriguez's opening statement noted, among other things, that "[p]erhaps the most sinister threat to the preservation of our democratic society, in this atmosphere of public distrust of government, is the abuse of our election system. One symptom *239 of what's wrong with the electoral system is our target here  the apparent inability of government to guarantee the integrity of absentee voting procedures under law." State of New Jersey Commission of Investigation, Tenth Annual Report, Investigation of Abuses of New Jersey's Absentee Ballot Law, 48 (1978). A principal witness before the Commission was Criminal Justice Director Stier who recounted the investigations his department had undertaken into absentee ballot abuse. Mr. Stier observed that although the then existing election laws surrounded the polling place with a great deal of protection, these same laws heightened the potential for fraud in the absentee voting process. Id. at 53. Mr. Stier recognized that in many cases people who use absentee ballots are "the kind of people who are most susceptible to influences; to pressures. People who cast absentee ballots are very often alone; very often isolated from the rest of the community; in many cases they are ill or infirm." Ibid. He urged that although the system should provide easy access of the voter to use of the absentee ballot without bureaucratic impairment of the ability of the voter to cast his vote, such public policy must be "balanced against the serious opportunities for fraud and improper influence which now exists under the absentee-ballot scheme under which we operate." Id. at 54.
The Commission conducted hearings into the manner the absentee ballot process had been used in North Bergen, Chesilhurst, Fieldsboro, Sea Isle City and Paterson. The results are characterized in the Commission's closing statement of the Tenth Annual Report:
In truth, as that testimonial indictment of the process has demonstrated here, the Absentee Voting Law has not merely been disregarded. It has, in fact, also been twisted, stretched, erased, altered and otherwise blatantly disobeyed  all for the evil intention of electing favored candidates to office no matter whether or not a majority of legal voters wished these particular candidates to be elected. And this misconduct has plagued every phase of the statute, depending upon the callous political design of the manipulators or on their special capability for more expertly negating one or another of the statutory controls.
These all too numerous revelations of abuses of the Absentee Ballot Law were the result of investigations throughout the state that had various origins. While *240 the Commission was conducting its own inquiry, the office of Attorney General Degnan and several county prosecutors were probing into related allegations of wrongdoing. Because of certain difficulties attributable to the often ambiguous provisions of the law and the indistinct breadth of provisions in the overall Title 19 Election Law relative to criminal violations and sanctions, a consensus developed that these various probes be incorporated into the Commission's projects for a continued factfinding investigation by our agency leading to a public exposure of the law's deficiencies and its misapplication in local elections. These mutual efforts led to the public forum that has now concluded  and which will generate recommendations for safeguarding the statute against further misuse and disregard. [Id. at 201-202.]
The problem present in the instant case where, in a close contest, absentee ballots can influence the electoral result was addressed:
Allow me to refer again to that recent survey by Secretary of State Donald Lan's office which demonstrated in part, the close margin of under 100 votes by which almost 200 municipal elections alone were decided in 1978. The Commission's staff made a rough check of 30 of those communities where local contests were decided by a mere 10 votes or less. With respect to the subject of this public hearing, our staff determined through direct contact with the appropriate county boards of election which of these 30 contests could have been decided by absentee ballots alone. This follow-up study revealed that in all but 10 of these 30 municipal contests, absentee ballots  legally or illegally  could have been pivotal in determining the winning candidates.
I also noted in a previous statement the sorry spectacle of increasing public refusal to exercise one of our most critical responsibilities  that is, our privilege of voting by going to the polls or casting an absentee ballot. I renew the Commission's extremely strong concern that, in any light vote situation, each vote that is cast becomes more significant. This throws a sharper spotlight on the need to guarantee by adequate law that every vote is a truly legal ballot reflecting only the voter's choice at all elections and under any circumstance. [Id. at 202-203.]
Among other conclusions and recommendations the Commission report suggested revision of N.J.S.A. 19:57-23, characterized in its then existent state as "an open invitation to misconduct," particularly as to the method by which delivery of absentee ballots was to be made to the County Board of Election. Id. at 204. That subsection, as it existed in 1978, merely provided that the marked absentee ballot could either be mailed or delivered to the board without providing by whom it should be delivered.
*241 The Legislature responded to the need for reform and in 1981 made a number of revisions to the absentee balloting sections of the election law. Those pertinent to the instant case follow. By L. 1981 c. 390, § 5 the Legislature required that the outer envelope of the absentee ballot carry the following stamped or printed adjuration:
To protect your vote:
IT IS AGAINST THE LAW FOR ANYONE EXCEPT YOU THE VOTER TO MAIL OR TRANSPORT THIS BALLOT UNLESS THE ENVELOPE IS SEALED AND THE FOLLOWING IS COMPLETED.
 Ballot mailed or transported by
 _____________________________________
 (signature of bearer)
 _____________________________________
 (print name of bearer)
 _____________________________________
 (address of bearer)
 _____________________________________
N.J.S.A. 19:57-16.
N.J.S.A. 19:57-23 was amended by L. 1981, c. 390 § 8 to require that after the voter marked the ballot and sealed it in the inner and outer envelope the "sealed outer envelope with the inner envelope and the ballot enclosed therein shall then either be mailed with sufficient postage to the county board of elections to which it is addressed or delivered personally by the voter or a bearer designated by him to such board or its designee." The amended subsection also required that "[a]t the time any person delivers a ballot to the county board, he shall sign a record which the county shall maintain of all absentee ballots personally delivered to it." In conjunction with these changes N.J.S.A. 19:57-37.1 was enacted as an entirely new subsection. It required the absentee voter to play a significant role in the delivery process:
Delivery by person other than voter to county board or postal box
No person shall take an absentee ballot from a voter or other person having custody of it for the purpose of delivering it to the county board of elections or a postal box or post office, nor shall any voter permit any person to do so, unless the ballot is sealed in the outer envelope and the person who shall transport or *242 deliver it first signs and prints his name on the outer envelope. No other person shall attempt to do any of the foregoing. [Emphasis ours.]
The legislative statement accompanying the amendments to the election law, introduced as Assembly No. 669 on January 21, 1980, in pertinent part, noted:
Major exposures of absentee ballot abuses have dramatized the need for detailed changes and additions to the present law in order to ensure secrecy for the absentee voter and greater security and accountability in the handling of absentee ballots. This bill contains the following provisions regarding absentee voting:
....
8. A voter or a person having custody of an absentee ballot is prohibited from giving any other person the ballot to deliver or mail on his behalf unless the outer envelope is sealed and the person who is mailing or delivering the ballot signs and prints his name on the outer envelope.... [Statement, Assemb. Bill No. 669 (1980).]
These changes are of more than passing consequence. They represent a meaningful attempt by the Legislature to effectively guard against one avenue of possible electoral fraud in the process of pick up and delivery, i.e., the casting of absentee ballots. These reforms have particular significance where, as here, the ballots come from voters who reside in nursing homes and who may indeed be vulnerable to influences and pressures because they are often alone, isolated from the rest of the community and perhaps ill and infirm as Director Stier observed in his testimony before the State Commission of Investigation. The legislative concern is well founded and strong in purpose, the language employed is mandatory. The statutory right to exercise the absentee voting privilege is legislatively conditioned upon the requirement that the voter "shall" not permit any person to transport the ballot to the county board of elections unless the person is "a bearer designated by him" (N.J.S.A. 19:57-23) and that bearer "shall" not be given the sealed ballot unless the bearer "first signs and prints his name on the outer envelope." N.J.S.A. 19:57-37.1. The final step is that the county "shall" maintain a record "of all absentee ballots personally delivered to it" and the bearer "shall" sign such record. N.J.S.A. 19:57-23. The person who transports the ballot is *243 obviously the person who last had dealings with the absentee voter. The Legislature requires that his identity be made known by having the voter designate him, having him print and sign his name and finally having his identity recorded in the required county record. This latter requirement ensures that the deliverer is the bearer designated by the voter. These mandated procedures may well be the only means of tracing the delivery process and the Legislative purpose to guard against possible tampering with the ballot is defeated when the statutory imperatives are ignored.
Voiding of the ballot and disenfranchisement of the voter might be too harsh a remedy if the burden of compliance were merely placed on the bearer of the ballot and the county officials, but where the Legislature with apparent deliberation has placed the initial duty upon the voter not to permit anyone to take his ballot without first signing and printing his name on the outer envelope, such requirement, in light of the evils of possible tampering sought to be remedied, is not too much to ask as a requisite to the exercise of the statutory privilege to vote in absentia. That which was said in Byron, supra, equally applies to this case:
There is a close connection between the statutory delivery requirements and legislative concerns about fraud and secrecy. Fraud, in particular, is difficult to prove. The purpose of our statutes is to prevent fraud and preserve secrecy through strict procedural controls. A violation of these procedures, therefore, becomes very significant. Thus, the error here, unlike that in Wene v. Meyner, cannot be described as an `unwitting omission of a formal requirement otherwise supplied in substance.' Wene v. Meyner, supra, 13 N.J. at 196. [footnote omitted.]
In short, two of the vital concerns of the Legislature in enacting absentee voting legislation  preservation of the secrecy of ballot and prevention of fraud  were placed in jeopardy by the procedure adopted in these cases. The importance of vindicating these interests outweighs any countervailing concern over the disenfranchisement of voters. [165 N.J. Super. at 475-476.]
The legislative purpose to cure the illegalities present in Byron and developed in the State Commission of Investigation hearings and its report is rendered ineffective when the absentee voter fails to do that which is statutorily mandated nor is *244 the clear legislative intent fulfilled when the courts treat the statutory requirements as merely directory and nonenforceable once the vote is cast. The manner of properly casting an absentee ballot is here legislatively decreed. In this respect the present case and its issue are clearly distinguishable from that presented in Friends of Jim Usry v. Matthews, 187 N.J. Super. 176 (App.Div. 1982). The statutory requirements here involved, although facially procedural, have deliberate substantive purpose. Where they are not followed the vote is not a proper statutory vote and is subject to being invalidated.
It is to be noted that the attack here mounted is not one to invalidate the election of November 2, 1982. Thus, the provisions of N.J.S.A. 19:57-36 are irrelevant. The challenge is to certain absentee ballots improperly cast.
Accordingly, we vacate the summary judgment entered in the Law Division and remand the matter for a hearing as to petitioner's challenges to the nonconforming absentee ballots. If the ballots contained in the illegal outer envelopes can be identified they are invalid. Naturally, petitioner is put to her proof as to such identification and to the other allegations of improper process or fraud contained in her petition. The nature and extent of discovery, if needed, is left to the discretion of the trial court, but obviously some time limitations must be considered. Attention is directed to Evid.R. 31.
Reversed and remanded. Jurisdiction is not retained.