704 A.2d 1053

CATHERINE BARRETT, GEORGE BILLINGHAM, PAUL CANNON, ROBERT CLARK, DORIS E. COLBERT, DANIEL CONWAY, LOIS V. DOZIER, VELMA FOY, SR., JOSEPH J. GEORGE, JOHN H. GREEN, JAMES W. HASTINGS, VICTOR HOSTEN, ANDREW HOYT, CHARLES E. JAHN, HARRY L. JOHNSON, MARY T. MCCARTHY, VALENTINO H. MONTEPARO, ANNETTE F. PE-TROCELLI, ALBERTA POMEROY, ALEXANDER REVESZ, JR., BARBARA SEYMOUR, PAUL N. THOMPSON, JESSIE TURNER, ELLEN UELAND, KATHERINE VECCHIO, ZELDA ZARIN, ALAN ZOLKOWITZ, PLAINTIFFS, v. MONMOUTH COUNTY BOARD OF ELECTIONS, COUNTY CLERK OF ELECTIONS, COMMISSIONER OF REGISTRATION AND SUPERINTEN-DENT OF ELECTIONS, DEFENDANTS.

LOUISE MURRAY, PLAINTIFF, v. CLAIRE FRENCH, MONMOUTH COUNTY CLERK; MONMOUTH COUNTY BOARD OF ELEC-TIONS; KENNETH "BUTCH" SAUNDERS; JAMES CONDOS; AND SHEILA SOLOMON; JOHN HAMILTON AND ALBERT REINOSO, DEFENDANTS.

Superior Court of New Jersey
Law Division
Monmouth County

Decided July 16, 1997.

404

*Albert J. Rescinio*, Esq. For Plaintiffs (*Albert. J. Rescinio*, Esq.).

*Francine W. Kaplan*, DAG, for Monmouth County Board of Elections, Commissioner of Registration and Superintendent of Elections (Attorney General of New Jersey).

*Peter M. O'Mara*, Esq., for Plaintiff (*Peter M. O'Mara*, Esq.).

*Dwayne D. Warren*, Esq., for Albert Reinoso (*Schwartz, Simon, Edelstein, Celso & Kessler*).

*Richard T. O'Connor*, for Claire French, Monmouth County Clerk (*Richard T. O'Connor*, Esq.)

*Francine W. Kaplan*, DAG, for Monmouth County Board of Elections (Attorney General of New Jersey).

LEHRER, J.S.C.

## FACTS

On May 13, 1997, the City of Asbury Park conducted an election for the entire city council; five seats in total were to be filled.

Eleven formally nominated candidates were printed on the ballot. The first five names on the ballot, Kenneth "Butch" Saunders, Sheila Solomon, Al Reinoso, James G. Condos, and John J. Hamilton, Jr., ran next to the "Asbury First" slogan.

The next five names on the ballot, Lawson June, Jr., Robert Lee Sanders, Louise L. Murray, John Loffredo, and Louise M. Singleton ran next to the slogan "Make a Difference". Mohinder "Moe" Singh appeared last on the ballot and did not run next to a slogan.

The candidates running next to the "Asbury First" slogan, Kenneth "Butch" Saunders, James Condos, Sheila Solomon, John Hamilton and Albert Reinoso received the most votes. Albert Reinoso was the lowest of the five, receiving 969 votes. Louise Murray, a "Make a Difference" candidate was the sixth highest receiving 955 votes, 14 votes less than Albert Reinoso.

On June 11, 1997, Louise Murray filed a petition to contest the election pursuant to *N.J.S.A.* 19:29–1 *et seq.* Ms. Murray alleged 27 legal votes were rejected and 59 illegal votes were counted. On the same date, the 27 voters also filed a petition to have their votes counted; the matters were consolidated and tried together.

During the trial, Ms. Murray withdrew the allegation concerning 56 of the 59 votes and seeks to void 3 of the 59 votes as illegal.

The 27 individual petitioners reside in a senior citizen, state licensed, class C boarding home known as the Atlantic Belmont

Hotel located at 300–302 Asbury Avenue, Asbury Park, New Jersey. Ms. Kathryn McGlynn, a registered nurse, is the owner-operator of the Atlantic Belmont Hotel. Ms. McGlynn has lived in the hotel for 18 years.

The hotel houses approximately 65 senior citizens who suffer from various ailments and need some level of assistance in their daily living. Ms. McGlynn provides that assistance to include distribution of medication, preparation of three meals daily, and receiving and distributing mail. Other needs of the residents are met as the occasion requires.

Of the 65 residents, 45 are registered voters. Due to their advanced age, various disabilities, and anticipated inability to get to the polls, 30 residents applied for, received, and voted absentee ballots. Ms. McGlynn filled out the request for an absentee ballot for any resident who asked for her help. After the request was filled out, the resident signed the request which was mailed to the County of Monmouth for processing.

Before the absentee ballots were received, and 7 days before the election, Ms. McGlynn was asked by some of the residents to discuss her voting preferences. In response, Ms. McGlynn testified she discussed the candidates she believed would be most favorable to the mutual interest of keeping boarding homes open and funded in the City of Asbury Park. No other evidence was produced of any discussion as to the election or the candidates.

Mail is routinely distributed to the residents at their evening meal. On the Wednesday before the election, the absentee ballots were received by mail. At dinner that night, Ms. McGlynn announced that those who wished to vote by absentee ballot should do so after dinner. Ms. McGlynn testified she decided to have all residents vote at that time because she was leaving for Florida the next day and would not have any other time to help the residents should they need it.

After dinner, Ms. McGlynn distributed the ballots with the assistance of LouAnn Pouzenc, a friend who helped out at the

hotel from time to time. After the absentee ballots were distributed, some of the residents remained in the dining room to complete their ballots while others returned to their room to do so. Those that remained in the dining room either sat alone while casting their vote, or sat at a table with a small group of others. Each voter punched his or her own ballot; placed the voted ballot into the inner envelope; sealed the inner envelope; and signed the absentee voter certificate on the inner envelope.

While the residents were voting, Ms. McGlynn continued to work in the kitchen until the absentee voters called her back to the dining room after they were finished voting. When Ms. McGlynn and Ms. Pouzenc reentered the dining room, the ballots were sealed in the inner envelopes and the voters had affixed their signatures on the appropriate place on the inner envelopes. Due to the physical ailments of some of the voters, the assistance of either Ms. McGlynn or Ms. Pouzenc was sought in completing the absentee voter certificate on the outside of the inner envelope. The only assistance provided entailed the printing of the voter's name and address on the top portion of the certificate after the inner envelope was sealed and signed in private.

Ms. McGlynn testified she initially helped one elderly resident fill out the return address because of handwriting problems. After she helped one resident, the others began to request that she do the same for them. Ms. McGlynn and Ms. Pouzenc complied by printing the return address on the inner and outer envelopes. Thereafter, the inner envelope was placed in the outer envelope by the voter, sealed and a stamp was placed on the outer envelope. The voter placed the completed absentee ballot in a basket in the dining room from which a postal worker picks up the mail daily. Some of the residents voted their ballots in their rooms with no assistance.

Ms. McGlynn testified 33 absentee ballots were received by residents, 30 of which were voted and mailed. Three residents chose not to vote and Ms. McGlynn destroyed their ballots at the request of those residents. Of the 30 that did vote, 27 were

voided on election day in a brief judicial proceeding and 3 were counted. Of the 27 that were voided, one voter has since died and another has been moved by her family to the mid-western United States.

Ms. McGlynn testified she aided the residents in filling out the return addresses when asked because of their illegible writing due to shaky hands from medication, arthritis, or age. This has been verified by certifications filed by all voters in this action.

It is undisputed that neither Ms. McGlynn nor Ms. Pouzenc signed the assistor certificate on the inner envelope.

Ms. McGlynn testified she rendered assistance to resident absentee voters in the past, including reading and punching the ballot for the voter. She testified, in the past, when she helped mark the ballot, she signed the certificate as the assistor on the flap of the inner envelope. She did so because she was aware of the vote as she helped mark the ballot. Ms. McGlynn further testified she did not sign the assistor certification in this matter as she thought it was not required; she did not help any of the voters mark their ballot; nor did she know the vote. All ballots were sealed and signed before assistance was rendered. Ms. Pouzenc testified to the same effect.

Ms. Donna Dawes, Chairperson of the Monmouth County Board of Elections, testified that the board noticed a pattern of similar handwriting on the return addresses of the 27 ballots which did not match the signatures. This indicated to the board that the 27 voters had help, but there was no signature on the assistor certificate.

The board considered the 27 ballots and deadlocked 2 to 2 as to whether to void them or count them. Due to the deadlock, the matter proceeded to a brief, emergent judicial proceeding which resulted in the 27 ballots not being counted on election day.

The consolidated plaintiffs allege that 27 legal absentee ballots were not counted, and if counted, they would change the 14

vote margin of victory. These allegations raise a novel issue to be decided by the court:

Does the failure to complete the assistor certification by a person providing assistance to an absentee voter invalidate the ballot where the assistance is ministerial in nature and does not have the potential to breach the secrecy of the ballot or endanger the integrity of the voting process?

■ The right to contest an election and the procedure thereof is strictly a matter of legislative determination which must be followed. *In re Petition of Clee,* 119 *N.J.L.* 310, 196 *A.* 476 (Sup.Ct.1938). Pursuant to *N.J.S.A.* 19:29–1, there are specific statutory grounds upon which a contest must be based. The two that are asserted here are found in *N.J.S.A.* 19:29–1(e) and (f):

The * * * election of any person to any public office may be contested * * * upon 1 or more of the following grounds:

e. When illegal votes have been received, or legal votes rejected at the polls, sufficient to change the result;

f. For any error by any board of canvassers in counting the votes or declaring the result of the election, if such error would change the result;

■ The fundamental purpose of an election contest is to ascertain the true will of the electorate. *Wene v. Meyner,* 13 *N.J.* 185, 196, 98 *A.2d* 573 (1953). The burden of proof lies upon the contestant to show that such will was thwarted, upon one or several of the statutory grounds. *In re Application of Moffat,* 142 *N.J.Super.* 217, 361 *A.2d* 74 (App.Div.1976).

The absentee ballot law of New Jersey is set forth at *N.J.S.A.* 19:57–1 *et seq.* The law requires that an individual who is entitled to vote by absentee, and has applied for an absentee ballot, shall be sent one accompanied by two envelopes; one of which is large enough to contain the other. The smaller or inner envelope is intended to contain the actual absentee ballot. After the ballot is marked it is then sealed inside the inner envelope. On the outside flap of the inner envelope is a printed certificate which the voter completes to certify that he or she is the person who applied for the absentee ballot and that, except for assistance by another in certain circumstances, the voter marked and sealed the ballot in secret. The inner envelope containing the ballot and the certificate is then to be placed inside the larger or outer envelope. The

outer envelope containing the inner envelope and ballot is then to be delivered to the Board of Elections prior to the election. *N.J.S.A.* 19:57–3; *N.J.S.A.* 19:57–16; *N.J.S.A.* 19:57–23.

The 27 absentee ballots were initially questioned and ultimately not counted due to a discrepancy between the printed names and return addresses on the envelopes and the signature on the voter certificate. There was no indication that the voter had received assistance from another in completing the absentee ballot as required by *N.J.S.A.* 19:57–23 which provides:

> "An incapacitated absentee voter shall also be entitled to assistance from a person other than a family member in [completing his or her absentee ballot]. The ... other person providing such assistance shall certify that he did assist the voter and will maintain the secrecy of the vote by both printing and signing his name in the space provided in the certificate".

The undisputed testimony indicates assistance was given to the voters only after they marked their own ballot in secret, placed the marked ballot in the inner envelope, sealed the inner envelope, and signed their own name to the "certificate of civilian absentee voter".

Thereafter, it is undisputed that either Ms. McGlynn or Ms. Pouzenc rendered ministerial assistance to the 27 voters by printing their name and return address on the inner and outer envelopes due to the difficulty the voters had in printing.

Ms. McGlynn and Ms. Pouzenc testified the assistance rendered was necessary due to the various disabilities of the voters that made their printing almost unreadable. One voter testified that he needed assistance in printing the top portion of the certificate because he was unable to do so due to arthritis and a nerve condition in his right arm which make his handwriting "atrocious."

It is clear from the undisputed evidence that the plaintiffs were incapacitated, absentee voters within the meaning of the act and thereby entitled to receive assistance from both Ms. McGlynn and Ms. Pouzenc in completing their absentee ballots. *See N.J.S.A.* 19:57–2; *N.J.S.A.* 19:57–23.

The issue presented is whether the failure, under the circumstances presented, to sign the assistor certification renders the ballots invalid.

To decide this issue, this court must look to the specific legislative intent behind the provision itself and the goals sought to be obtained by the act in general. In *In re Petition of Byron*, 165 *N.J.Super.* 468, 398 *A.*2d 599 (Law Div.1978), *aff'd*, 170 *N.J.Super.* 410, 406 *A.*2d 982 (App.Div.1979), *certif. denied*, 82 *N.J.* 280, 412 *A.*2d 786 (1979), the court stated at page 473, 398 *A.*2d 599:

"Since the public election mechanism is entirely a statutory creation lacking any common-law antecedents, the judiciary must always seek to vindicate the perceived intent of the legislature in the particular situation".

■ The clear objective of the Absentee Voter Act is to facilitate the exercise of the franchise of voters while preventing fraud and preserving secrecy and the integrity of the voting process. A close examination of the assistor certificate requirement contained in *N.J.S.A.* 19:57–17 and *N.J.S.A.* 19:57–23 reveals that the intent is to foster these goals.

*N.J.S.A* 19:57–17 provides for the form of the certificate at issue:

CERTIFICATE OF CIVILIAN ABSENTEE VOTER

By signing the voter certificate, the absentee voter certifies that they are aware of the penalties for fraudulent voting, that they are the person who applied for the enclosed ballot, and that they marked and sealed the ballot and certificate in secret.

The signature requirement permits comparison of the signature on the application for an absentee ballot to the signature on the

absentee ballot and to the signature in the voter registration book to prevent fraud. It assures the integrity of the election process by requiring a certification that the voter in fact cast the absentee ballot in accordance with the law and in secret.

The express terms of the assistor certificate require the person providing assistance certify that they will maintain the secrecy of the ballot. The purpose of the signature of the assistor is to preserve the secrecy of the ballot and identify the assistor who helped the voter cast the ballot should the integrity of the process be questioned.

Neither Ms. McGlynn nor Ms. Pouzenc assisted any of the voters in the casting of a ballot, nor did they observe any ballot cast by any of the plaintiffs. Rather, the assistance that the two provided was the ministerial act of printing the name and address of the voter so the vote could be clearly identified. This was done after the ballot had been marked and sealed in the inner envelope, and after the voter had signed the voter certificate. The legislative purpose behind the requirement of the assistor was not breached as the secrecy of any ballot was never at risk. The integrity of the process was never endangered or compromised.

At trial, both Ms. McGlynn and Ms. Pouzenc testified that it was their understanding that the assistor certificate was to be signed only if assistance was given in actually marking the ballot or where the assistor saw the ballot or knew the vote. In the past when Ms. McGlynn was asked to help a resident mark the ballot, she signed the assistor certification. Since no such assistance was given, neither Ms. McGlynn nor Ms. Pouzenc felt that the express language of the assistor certification or the law required its execution.

The plain language of the assistor certificate supports this position. The assistor certificate provides:

"I do hereby certify that I am the person who provided assistance to this voter and declare I will maintain the secrecy of this ballot".

The certificate does not indicate all assistance must be certified; only assistance that could breach the secrecy of the ballot. How-

ever, a literal reading of the law requires any assistance to be certified. *N.J.S.A.* 19:57–23 in relevant part provides:

*     *     *     *     *     *     *     *

"No absentee voter shall permit any person *in any way,* except as provided hereafter, to unseal, mark or inspect their ballot, interfere with the secrecy of the absentee ballot vote, *complete or sign the certificate,* or seal the inner or outer envelope, nor shall any person do so."

* * *An incapacitated absentee voter shall also be entitled to the assistance from a person in performing any such actions. The * * * person providing such assistance shall certify that they did assist the voter and will maintain the secrecy of the vote * * *. (Emphasis added).

(The court has altered the language of the statute to make it gender neutral.)

An assistor reading only the certification without a copy of the statute could in good faith honestly believe the act of printing the name and return address of a voter did not require certification if the secrecy of the ballots was never at issue.

The court strongly recommends legislative clarification to avoid similar situations in the future.

It is urged that the decision in *Gramlich v. Cottrell,* 204 *N.J.Super.* 490, 499 *A.*2d 275 (Law Div.1985) mandates the 27 votes not be counted; the court does not agree.

In *Gramlich v. Cottrell,* a candidate sought to invalidate eighteen absentee ballots cast by residents of a nursing home. Charles Broomall, Jr. was the director of recreation and volunteer services for the nursing home. He was also a candidate for city counsel. Broomall provided assistance to all eighteen nursing home residents in completing their absentee ballots and signed the certificate as having done so. However, Mary Ellen Motto and Pamela Thompson, both nursing home employees, also provided assistance to some of the 18 nursing home residents but failed to sign the certificate as having provided assistance. The assistance provided by Broomall, Motto and Thompson included writing the names of the committee candidates on the ballots; punching holes in the ballot card next to the candidate's name; filling in information on the ballot certificate; and transporting or mailing the ballot. Although the court invalidated the eighteen ballots pri-

marily upon the express prohibition of a candidate providing assistance to an incapacitated voter, the court also acknowledged that neither Ms. Motto nor Ms. Thompson had signed the certificate as individuals who had provided assistance to the absentee voters. Specifically, the court stated at page 494, 499 *A*.2d 275:

"Ballot secrecy was also impugned by the procedure here followed. For a majority of the absentee voters both Broomall and ... either Motto or Thompson jointly provided 'assistance.' Neither Motto nor Thompson certified 'that she did assist the voter and will maintain the secrecy of the vote by both printing and signing her name in the space provided on the certificate' as required by *N.J.S.A.* 19:57–23."

*Gramlich* is distinguishable in that the person providing the assistance actually assisted in the casting of the absentee vote. By doing so, the secrecy of the vote was placed directly at risk. Under those circumstances, it is imperative that the persons rendering assistance sign the certificate and certify that they would maintain the secrecy of the vote. In the matter currently before the court, the secrecy of the 27 votes was never in jeopardy.

The absentee voting act was created to facilitate the exercise of the franchise of voters who would normally not be able to vote due to enumerated special circumstances which the legislature recognized as likely deterrents to voting. In furthering this objective, it is the stated legislative intent that the law be "liberally construed." *N.J.S.A.* 19:57–3.

The act should be construed consistent with the goals of preserving the enfranchisement of qualified voters, safeguarding the secrecy of the ballot, preventing fraud and maintaining the integrity of the election process. *In re Battle Petition,* 190 *N.J.Super.* 232, 236, 462 *A*.2d 1291 (App.Div.1983), *aff'd as modified by,* 96 *N.J.* 63, 473 *A*.2d 980 (1984); *Application of Langbaum,* 201 *N.J.Super.* 484, 490, 493 *A*.2d 580 (App.Div.1985); *In re Petition of Byron,* 165 *N.J.Super.* 468, 474, 398 *A*.2d 599 (Law Div.1978), *aff'd,* 170 *N.J.Super.* 410, 406 *A*.2d 982 (App.Div.1979), *certif. denied,* 82 *N.J.* 280, 412 *A*.2d 786 (1979); *Matter of Mallon,* 232 *N.J.Super.* 249, 556 *A*.2d 1271 (App.Div.1989); *Petition of*

*Kriso,* 276 *N.J.Super.* 337, 647 *A.2d* 1373 (App.Div.1994). The *Battle* court stated at page 236, 462 *A.2d* 1291:

"Although the legislative enactment here considered is to be liberally construed to effectuate the purpose of enabling a registered civilian absentee voter to cast his or her vote (*N.J.S.A.* 19:57–3), the manner and method by which this shall be accomplished is subject to the valid legislative concern that not only the voter but the process of exercising the vote be secure from the opportunity for fraud".

■ If an irregularity is found which goes to the secrecy or security of the balloting process, that ballot must be voided. In *Sharrock v. Keansburg,* 15 *N.J.Super.* 11, 83 *A.2d* 11 (App.Div. 1951), the court stated at pages 16–17, 83 *A.2d* 11:

"If the election statute 'expressly declares a specific irregularity shall nullify an election, the courts, irrespective of their views of the wisdom or serviceability of the requirement, uniformly respect the legislative declaration' ".

A fair, practical and common sense application of the law mandates the 27 votes be counted. Through the course of the trial, the court was permitted to observe the demeanor and credibility of all those who testified. Ms. McGlynn and Ms. Pouzenc were very credible witnesses who had only the best interests of the 27 voters in mind. They were motivated only by the desire to help 27 people who wished to exercise their constitutional right to vote. The assistance they provided was ministerial and designed to facilitate the voting process by clearly identifying the absentee voter through legible printed names and return addresses.

There has been no evidence presented to give any reason to suspect that any undue influence was or could have been exerted in the voting process, that the secrecy of any vote was at risk or that the integrity of the electoral process was compromised.

The voters who testified were credible, sincere and honest when they stated that they believed that they had properly and in good faith exercised their right to vote and wanted their votes to count. To disenfranchise these voters for, at worst, a good faith technical violation of the law would serve no legislative or other legitimate purpose. The secrecy of the votes was unquestionably preserved

and the electoral process was not compromised. *Petition of Kriso, Supra,* at pages 344–345, 647 *A.*2d 1373.

It is therefore ordered that the Monmouth County Board of Elections count the 27 absentee ballots and report the results to the Municipal Clerk of the City of Asbury Park for certification of the election within 3 days.

## THE BALLOT OF VELMA FOY

■ Mr. Velma Foy, Sr., voted by absentee ballot. His ballot is 1 of the 27 ordered to be counted. According to Mr. Foy's absentee ballot application, he sought to vote by absentee for health reasons. However, Mr. Foy testified at trial, he did not suffer from a disability, ailment or any other reason which would prohibit him from casting a vote at the polls on election day. At the time Mr. Foy completed his absentee ballot application, he apparently did not qualify to vote by absentee ballot.

*N.J.S.A.* 19:57–3 details the persons who are entitled to vote by absentee ballot. That statute provides in part:

> **The following persons shall be entitled to vote by absentee ballot in any election to be held in this state . . . :**
>
> **A civilian absentee voter who expects to be or may be absent outside the state . . . on the day on which an election is held or may be within the state on the day of any election but because of permanent and total disability, or because of illness or temporary physical disability, or because of the observance of a religious holiday pursuant to the tenets of his/her religion, or because of resident attendance at a school, college or university, or because of the nature and hours of his/her employment, will be unable to cast their ballot at the polling place in their election district on the day of the election . . .**
>
> **(The court has modified the statute to make it gender neutral.)**

Once an individual in good faith believes that he or she qualifies as an absentee voter, he or she may apply for an absentee ballot. The application is made to the County Clerk, in writing, signed by the applicant stating his or her place of voting residence and the address to which the ballot shall be sent, and the reason for the absentee ballot request. *N.J.S.A.* 19:57–6; *N.J.S.A.* 19:57–4.

The County Clerk then examines the application. If the Clerk is satisfied that the applicant is entitled to an absentee ballot, a

ballot is then forwarded. *N.J.S.A.* 19:57–10; *N.J.S.A.* 19:57–11. After an absentee ballot is forwarded to the voter, the voter registration is initialed "a" in red ink next to the voter's name in order to prevent the voter from voting twice in the election (once by absentee and a second time at the polls). *N.J.S.A.* 19:57–22. After an absentee ballot is forwarded to a voter and the voter registration book marked accordingly, that voter is prohibited from voting at the polls. *N.J.S.A.* 19:57–28; *Petition of Kriso,* 276 *N.J.Super.,* 337, 341, 647 *A.*2d 1373 (App.Div.1994) ("a voter who obtains an absentee ballot because he or she anticipates being physically unable to cast a ballot at the polls on election day is prohibited from voting in person and instead must use his or her absentee ballot").

Mr. Foy's vote also raises a novel issue to be decided by this court:

**Should the good faith but erroneous application for an absentee ballot result in the voiding of the ballot?**

No New Jersey court has dealt directly with the issue. The only court that has addressed this precise issue is the New Mexico Supreme Court in *Kiehne v. Atwood,* 93 *N.M.* 657, 604 *P.*2d 123 (1979). In that case, a number of voters applied for absentee ballots claiming to be unable to vote at the polls on election day. The facts disclosed the voters were present in the county on election day and able to vote at the polls. At trial, it was revealed that the reasons given by those voters for requesting an absentee ballot differed from the reasons set forth in their applications. Some voters testified that they sought absentee ballots because they disliked voting at the voting machine. Other voters testified that they planned to be present in the county on election day but deliberately stated in their application that they would be out of the county on that day. Others testified that they legitimately thought that they were going to be out of the county on election day due to business or illness.

In relying on the plain language of the statute, the New Mexico Supreme Court held that the votes by voters who had no known

reason for applying for or voting by an absentee ballot were void. It reasoned that the statute contemplated that the person requesting an absentee ballot must have some statutory reason for doing so. The New Mexico Supreme Court also held that the votes by voters who in good faith had a reasonable belief that they may be unable to vote in person at the polls for a specified statutory reason were valid even though those voters could have voted at the polls on election day. The New Mexico Supreme Court distinguished between those voters who obtained their absentee ballot by intentional deception from those voters who obtained their absentee ballot in good faith.

At trial, no evidence was produced of fraud or intentional deception on the part of Mr. Foy in seeking to obtain an absentee ballot. To the contrary, the testimony given by Mr. Foy demonstrated that he sought to obtain and vote an absentee ballot in good faith. Mr. Foy's undisputed testimony revealed that he was an elderly gentleman who had moved into the Atlantic Belmont Hotel five months before the election; he was new to the area and was not familiar with the location of the Asbury Park polling places; Mr. Foy had limited means of transportation available to him, therefore, his ability to reach the polling place on election day was uncertain. Mr. Foy was aware that 32 of his co-residents applied for absentee ballots. It is therefore reasonable to assume that Mr. Foy, in good faith, believed that he too was entitled to vote by absentee.

> "The precious right of a citizen to cast their ballot cannot be frustrated by technical difficulties or election law administration where the voter is qualified and attempting to exercise their franchise in good faith * * * nor shall a voter have to engage counsel to advise him or her how to vote by absentee ballot. *In re Farley,* 78 *N.J.Super.* 349, 362 [188 *A.*2d 607] (App.Div.1963) *certif. denied,* 40 *N.J.* 220 [191 *A.*2d 61] (1963)".

The New Jersey legislature has mandated that the absentee voting law, *N.J.S.A.* 19:57–1 *et seq* be liberally construed to effectuate its purpose to facilitate the franchise of voters while preserving the secrecy and the integrity of the voting process.

*N.J.S.A.* 19:57–3, *Petition of Kriso, supra* at 344–345, 647 *A.*2d 1373.

The good faith mistaken belief on the part of Mr. Foy that he was entitled to vote by way of absentee ballot should not deprive him of his franchise. Mr. Foy's honest mistake does not violate the secrecy of his ballot or rise to the level of fraud that would jeopardize the integrity of the voting process, nor do his actions have the potential to do so.

It is ordered that Mr. Foy's vote shall be counted as part of the 27, and not invalidated.

Separate issues were raised as to the validity of 3 other ballots. These ballots and their gathering process are currently being investigated by other authorities. Should those ballots have the potential to change the results of the election after the count of the 27, the court will take additional testimony and make additional rulings. *N.J.S.A.* 19:29–1.